**Ernest S. BINS, Plaintiff–Appellant,**

v.

**EXXON COMPANY U.S.A., a division of Exxon Corp., Defendant–Appellee.**

No. 98–55662.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted En Banc March 20, 2000

Filed Aug. 10, 2000

Thomas G. Moukawsher, Moukawsher & Walsh, LLC, Groton, Connecticut, for the plaintiff-appellant.

James Severson, John R. Reese, Robert A. Bundage, Heather C. Beatty, Allyson W. Sonenshine, McCutchen, Doyle, Brown & Enersen, LLP, Los Angeles, California, and David M. Rivet, Exxon Company, U.S.A., Houston, Texas, for the defendant-appellee.

Paul W. Crane, Jr., Paul, Hastings, Janofsky, Waslker, San Francisco, California, for amicus California Employment Law Council.

Hollis T. Hurd, Smith & Downey, P.A., Pittsburgh, Pennsylvania, and Stephen A. Bokat, Robin S. Conrad, Sussan Mahallati Kysela, National Chamber Litigation Center, Inc., Washington, D.C., for amicus Chamber of Commerce of the United States.

Before: HUG, Chief Judge, BROWNING, SCHROEDER, O'SCANNLAIN, FERNANDEZ, KLEINFELD, HAWKINS, TASHIMA, MCKEOWN, WARDLAW and FISHER, Circuit Judges.

Opinion by Judge FISHER; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

FISHER, Circuit Judge:

We must determine in this case the point at which an employer who adminis-ters a plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, has a duty to inform plan participants that it is considering a proposal to offer more generous retirement incentive benefits.[1] Appellant Ernest Bins worked for Exxon, U.S.A. ("EUSA"), a division of Exxon Corporation ("Exxon"), for 15 years. In the months before he retired, Bins unsuccessfully attempted to confirm rumors that EUSA was considering offering eligible employees a lump-sum retirement incentive under an existing welfare benefit plan covered by ERISA. Two weeks after Bins retired, EUSA announced precisely the sort of retirement incentive about which Bins had inquired.

The nature and extent of an ERISA fiduciary's duties in these circumstances is a matter of first impression in this Circuit. We recognize, therefore, that the district court did not have any guidance from this Court when it made its ruling. We have jurisdiction under 28 U.S.C. § 1291. We review de novo a decision granting summary judgment, *see Williams v. Caterpillar, Inc.*, 944 F.2d 658, 661 (9th Cir.1991), and we reverse. We hold that when a plan participant inquires about potential plan changes, an employer-fiduciary has a duty to provide complete and truthful information about any such changes then under serious consideration. In the absence of an employee inquiry, however, the employer-fiduciary does not have an affirmative duty to volunteer information about any changes prior to their final adoption. We further hold that an employer does not have a duty to follow up with an employee if, subsequent to the employee's inquiry, the proposed changes reach the serious consideration stage, unless the employer agrees to do so.

## FACTS[2]

Ernest Bins worked for EUSA as a Senior Mechanical Technician on an off-

---

1. Throughout this opinion, references to "employer" or "employer-fiduciary" assume an employer that is a plan administrator.

2. We recite the facts as developed in the record on the motion for summary judgment, without intending to restrict the district court's authority to find otherwise at trial.

shore oil drilling rig. He became eligible for retirement in the Summer of 1995 and decided to retire effective January 1, 1996. In the Fall of 1995, Bins began hearing rumors that, in addition to regular retirement benefits, EUSA would offer a lump-sum retirement incentive under the Special Program of Severance Allowances ("SPOSA"). The SPOSA is a pre-existing ERISA welfare benefit plan available on an as-needed basis that, once approved, would permit EUSA to pay special severance benefits to induce employees to retire early when EUSA decides to reduce its workforce.

Anxious to confirm the rumors, Bins asked everyone at EUSA to whom he had access and who he expected would have, or would be able to obtain, information about the likelihood of a SPOSA offering. He asked his supervisors, Mechanical Foreman Kelly Pease and Field Superintendent Jerry Odom, who told him that they had heard the same rumors but that they knew nothing about a SPOSA offering. Bins also asked his assigned benefits counselor, Becky Pilgrim, and a human resources advisor, Ray Julson. According to Bins, he had been instructed that either of these two individuals was a proper company representative through whom to direct questions to the company about employee benefits. They both told him truthfully that they knew nothing about a SPOSA offering.

Bins decided to postpone his retirement to February 1, 1996, in part because of rumors about the new SPOSA offering and in part because he wanted to avoid a penalty for early withdrawal from his thrift account. In November 1995, Bins attended a retirement seminar conducted by Lea Connor, an Exxon attorney. During the seminar, Connor truthfully answered another prospective retiree's question by stating that she had no knowledge of a new SPOSA offering. At Bins' retirement party on his last day of work, December 27, 1995, Bins asked his supervisor's supervisor, Dave Lucas, whether EUSA was going to offer SPOSA benefits. Lucas replied—again, truthfully—that he had no knowledge of such an offering.

From December 27, 1995 until his retirement on February 1, 1996, Bins used accrued vacation time to supplement his scheduled off-duty days and did not return to work. Bins could have acted to change his retirement date at any time prior to February 1, 1996. After December 27, however, he made no further inquiries into the possibility of a SPOSA offering, and no one told him about the likelihood of a change in benefits.

In the Fall of 1995, EUSA had initiated an Organization Effectiveness Study ("OES") Team to determine ways to optimize the Production Department in which Bins was employed. In November 1995, the OES Team recommended a reorganization of the Production Department—creating a 200–employee surplus—and an accompanying SPOSA offering to induce early retirement of excess workers. After preparing several proposals for structuring the reorganization and SPOSA, the OES Team submitted them to EUSA management. On November 29, 1995, EUSA Vice–President J.H. Peery reviewed the proposals. As manager of the Production Department, Peery was authorized to implement the SPOSA offering after obtaining final approval from Exxon. EUSA Senior Vice–President M.E. Foster reviewed the proposals on December 1, 1995, and EUSA President Ansel Condray first reviewed the proposals on December 15, 1995.

The record before us does not reveal the exact date on which EUSA first submitted the proposals to Exxon, but we know that on January 11, 1996, Exxon Senior Vice–President Harry Longwell favorably reviewed the reorganization proposal. We also know that EUSA President Condray conducted a final review of the reorganization and SPOSA proposals on January 24, 1996 and, on the same day, gave his approval to the Production Department to proceed with securing endorsement of the reorganization and the SPOSA from Exxon. On January 26, 1996, Exxon Senior

Vice–President Robert Wilhelm wrote a brief letter formally approving the proposed reorganization. On January 30, 1996, EUSA Human Resources Manager Asif Beg requested approval to implement the proposed SPOSA from Exxon Vice–President of Human Resources, D.S. Sanders. Sanders approved the SPOSA offering on February 2, 1996, and Beg received the approval on February 5, 1996.

On February 13, 1996, less than two weeks after Bins retired, EUSA publicly announced its reorganization plan and the availability of SPOSA benefits. Bins filed suit, contending EUSA had breached its duties as an ERISA fiduciary. Relying on *Fischer v. Philadelphia Electric Co.*, 96 F.3d 1533 (3d Cir.1996) (*"Fischer II"*), Bins argued that, once EUSA began "seriously considering" a proposal to offer enhanced benefits under the ERISA severance plan, it had a duty (1) to respond accurately and straightforwardly to his questions and to inform lower-level employees to whom he would turn with questions; (2) to follow up and notify him if serious consideration began after he made his inquiries; and (3) to volunteer information to all potential retirees even in the absence of specific questions.

EUSA moved for summary judgment. The district court applied *Fischer II* but, stressing the fact that EUSA could not approve the SPOSA, focused solely on the issue of when Exxon's senior management began serious consideration. With this focus, the district court concluded that there was no serious consideration of a proposal to offer SPOSA benefits as of December 27, 1995, the date of Bins' last inquiry. The district court held that serious consideration began on or about January 26, 1996—the date Exxon Senior Vice–President Wilhelm formally approved the proposed reorganization. Although Bins had not yet retired as of January 26, the district court concluded that, because Bins

had not specifically renewed his inquiry about SPOSA benefits, EUSA had no affirmative duty to inform him that it was considering such a proposal. Finding no breach of a fiduciary duty under ERISA, the district court granted summary judgment for EUSA.

### DISCUSSION

Congress enacted ERISA to protect participants and beneficiaries of employee benefit plans without discouraging employers from offering such plans. *See Varity Corp. v. Howe*, 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). ERISA establishes "standards of conduct, responsibility, and obligation for fiduciaries," and provides plan participants and beneficiaries with "appropriate remedies ... and ready access to the Federal courts." ERISA § 2(b), 29 U.S.C. § 1001(b) (quoted in *Varity*, 516 U.S. at 513, 116 S.Ct. 1065). In enacting ERISA, Congress painted with a broad brush, expecting the federal courts to develop a "federal common law of rights and obligations" interpreting ERISA's fiduciary standards. *Varity*, 516 U.S. at 497, 116 S.Ct. 1065 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)) (internal quotation marks omitted).

### A. *ERISA's Fiduciary Duty of Loyalty*

It is well established that a "company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan." *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995) (quoting *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir.1990)) (internal quotation marks omitted). That is, an employer does not act in its fiduciary capacity as a plan administrator when it makes a business decision to amend a plan. *See Cunha v. Ward Foods, Inc.*, 804 F.2d 1418, 1432–33 (9th Cir.1986).[3] Nevertheless, an

---

3. Of course, an employer may not amend an ERISA plan in a manner that would interfere with vested rights under the plan. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432,

438–41, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (discussing ERISA's vesting requirements); *Lockheed Corp. v. Spink*, 517 U.S. 882, 892 n. 5, 116 S.Ct. 1783, 135 L.Ed.2d

employer's obligations as an ERISA fiduciary are not suspended while it considers a proposal to amend an existing ERISA plan or to adopt a replacement plan. The core obligation of an ERISA fiduciary is to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1); *see also Varity,* 516 U.S. at 506, 116 S.Ct. 1065.[4] Looking to the common law of trusts for guidance, the Supreme Court has held that communicating information about likely future plan benefits falls within ERISA's statutory definition of a fiduciary act:

> Conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power "appropriate" to carrying out an important plan purpose. After all, ERISA itself specifically requires administrators to give beneficiaries certain information about the plan. *See, e.g.,* ERISA §§ 102, 104(b)(1), 105(a). And administrators, as part of their administrative responsibilities, frequently offer beneficiaries more than the minimum information that the statute requires-for example, answering beneficiaries' questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits. To offer beneficiaries detailed plan information in order to help them decide whether to remain with the plan is essentially the same kind of plan-related activity.

153 (1996). This case does not involve vested benefits.

**4.** ERISA § 404(a)(1) provides in pertinent part:
(a) Prudent man standard of care
(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and

*Varity,* 516 U.S. at 502–03, 116 S.Ct. 1065 (citing RESTATEMENT (SECOND) OF AGENCY, § 229(1) (1957)).

### B. *Serious Consideration*

Several of our sister circuits have adopted standards for determining when the likelihood that an employer will amend an ERISA plan to offer an enhanced retirement incentive or severance program is sufficiently substantial to require an employer who is also an ERISA fiduciary to communicate the potential amendment accurately and straightforwardly to inquiring plan participants. The leading case is *Fischer II,* from the Third Circuit, which holds that an employer-fiduciary must answer truthfully questions about the substance of a potential change in benefits if the employer is "seriously considering" such a proposal. 96 F.3d at 1538–40. According to *Fischer II,* serious consideration takes place when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Id.* at 1539. *Fischer II* treats these three parts not as isolated criteria but as related elements that must be analyzed together in an "inherently fact-specific" review to determine when the employer first seriously considered implementing a proposed change in benefits. *Id.*

Thus, under the *Fischer II* test, a potential change in retirement benefits becomes sufficiently likely—and therefore becomes sufficiently material to employment decisions of plan participants to trigger the fiduciary duty—when the employer-fiduciary seriously considers a proposal

(ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims[.]
29 U.S.C. § 1104(a)(1).

to change those benefits. Most of our sister circuits that have considered the question also have held "serious consideration" to be a critical, or at least relevant, point in the materiality inquiry. *See, e.g., McAuley v. IBM Corp., Inc.,* 165 F.3d 1038, 1043 (6th Cir.1999) (noting that " '[s]erious consideration' does not occur until a company 'focuses on a particular plan for a particular purpose,' " and finding *Fischer II*'s delineation of specific factors "useful to consider" when determining the issue of serious consideration (quoting *Muse v. IBM Corp.,* 103 F.3d 490, 494 (6th Cir.1996)));[5] *Vartanian v. Monsanto Co.,* 131 F.3d 264, 272 (1st Cir.1997) (applying *Fischer II,* but making explicit the requirement that the specific proposal at issue under consideration would "affect a person in the position of the plaintiff"); *Hockett v. Sun Co., Inc. (R & M),* 109 F.3d 1515, 1522–24 (10th Cir.1997) (adopting *Fischer II* without modification); *Ballone v. Eastman Kodak Co.,* 109 F.3d 117, 122, 124 (2d Cir.1997) (holding that "serious consideration" is a factor relevant to the materiality inquiry but not a "prerequisite").

We similarly believe that *Fischer II*'s serious consideration test is the proper tool for ensuring that an ERISA employer-fiduciary discharges its "duties with respect to a plan solely in the interest of the participants and beneficiaries," *Varity,* 516 U.S. at 506, 116 S.Ct. 1065 (quoting 29 U.S.C. § 1104(a)) (internal quotation marks omitted), without creating the unnecessary confusion that could result from a lower standard of materiality, *see Fischer II,* 96 F.3d at 1539. "Too low a standard could result in an avalanche of notices and disclosures.... The warning that a change in benefits was under serious consideration would become meaningless if cried too often." *Id.* Until review of a potential plan amendment reaches the serious consideration stage, the prospects for its ultimate adoption are sufficiently uncertain that it would be of questionable materiality to the decision-making process of a plan participant contemplating retirement. A rule requiring earlier disclosure risks being overly burdensome and could easily become counter-productive by discouraging employers from considering such proposals in the first place.

Nonetheless, we also recognize that the *Fischer II* test should not be applied so rigidly as to distract attention from the core inquiry, which must always be whether the employer-fiduciary has violated its fiduciary duty of loyalty to plan participants by failing to disclose material information. We agree with the First Circuit that the flexibility inherent in the *Fischer II* test is essential. *See Vartanian,* 131 F.3d at 272. "The ultimate question is whether 'a composite picture of serious consideration' has developed." *Id.* (quoting *Fischer II,* 96 F.3d at 1539). This flexibility is particularly necessary in cases that present evidence of an employer's "deliberate attempt to circumvent ERISA" by carefully patterning its conduct so as to evade one of the three factors.[6] *Id.* Any

---

**5.** The Sixth Circuit originated the concept of "serious consideration" as a trigger point for ERISA's fiduciary duty in *Berlin v. Michigan Bell Tel. Co.,* 858 F.2d 1154, 1163–64 (6th Cir.1988).

**6.** We make no assumptions about EUSA's motives but note that it did attempt to keep information about the potential SPOSA offering under tight wraps. On January 24, 1996, while Exxon was reviewing the reorganization proposal, EUSA Human Resources Operations Manager W.M. "Butch" Snow sent members of the EUSA Human Resources Department a confidential memorandum entitled "How to Respond to Questions Regarding SPOSA" and an attachment entitled "How Questions Regarding SPOSA Should Be Addressed/Legal Guidance/Organization Effectiveness Study Implementation." The memorandum and attachment provided a list of "acceptable responses" to questions from employees and their supervisors about the possibility of a new SPOSA offering.

Human resources personnel were instructed to reply as follows in response to employee inquiries: "The study is still under review. I don't know of a SPOSA having been approved." The Snow memorandum explained that if a supervisor asked whether he or she could discuss the possibility of SPOSA benefits with an employee who intended to retire as of February 1, human resources personnel

formalistic application of the test risks narrowing the fiduciary duty by giving the benefit of the doubt to employer-fiduciaries who comply with the words of the test but do not comply in spirit with their fiduciary obligations under ERISA. *See id.* With this framework in mind, we apply the serious consideration test to the facts of this case.

### 1. *"Specific Proposal"*

■ The primary function of this first element of the *Fischer II* test is to "distinguish[ ] serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options." *Fischer II*, 96 F.3d at 1539–40. Although the proposal need not "describe the plan in its final form," it must be "sufficiently concrete to support consideration by senior management for the purpose of implementation." *Id.* at 1540. The preliminary work done by the OES Team, whose focus "was to gather information, evaluate options, and develop strategies," *Declaration of W.M. Snow, EUSA Human Resources Operations Manager* (hereinafter "*Snow Decl.*") ¶ 6, thus does not satisfy the above standard. At the same time, however, Exxon's argument that the SPOSA proposal did not become "specific" until January 26, 1996, when EUSA senior management asked Exxon senior management for approval to implement the proposed SPOSA, probably focuses too late in the process.

Instead, we believe this first element may have been met soon after the OES Team completed its preliminary work, when it "prepared several proposals for structuring the reorganization and the SPOSA," *Snow Decl.* ¶ 5, and forwarded these proposals to EUSA senior management.[7] The record is not fully developed on this point, however, and on remand the district court should examine the content of those initial recommendations more closely before making a final determination. It may be that the proposals merely gave a rough, abstract outline of the various ways a reorganization and SPOSA offering could be structured, in which case they would not be sufficiently concrete to satisfy this prong of the test. On the other hand, it would be sufficient if the proposals laid out the possible options in more detail, thus permitting management to discuss them for the purpose of implementation.

That the OES Team presented EUSA management with several alternatives does not resolve the question against Bins, because, as *Fischer II* recognized, "[a] specific proposal can contain several alternatives." 96 F.3d at 1540. Nor is it dispositive that the OES Team's proposal may have undergone some changes before final approval and implementation, since "the plan as finally implemented may differ somewhat from the proposal." *Id.* Instead, the focus should be on whether, from management's perspective, the proposal was sufficiently concrete to permit a discussion about implementation. From the perspective of an employee like Bins,

---

should tell the supervisor not to initiate any SPOSA-related discussion with employees. Even if a supervisor knew the SPOSA offering had received final approval, supervisors were supposed to respond to questions by saying "[a]n announcement is scheduled for (*insert portion of the month* )." The memorandum explained that, to prevent supervisors from learning about SPOSA approval, "it is expected that any knowledge of SPOSA approval, if such approval is ever given, will be tightly held." It instructed human resources personnel that they should use the list of "acceptable responses" both to determine appropriate responses to questions and to advise local site managers and "natural leadership team members" about how to respond to SPOSA inquiries.

We express no opinion on the wisdom of limiting access to information about a possible change in benefits. However, if an interested employee inquires about a potential change after the serious consideration stage is reached, it would not be a defense that supervisors were unaware of the status and thus responded ignorantly but truthfully to the employee's inquiry.

7. The record indicates that the SPOSA was a pre-existing plan that was available on an as-needed basis, but subject to amendments and requiring final authorization from Exxon.

what is material to his retirement decision is that a SPOSA offering is likely; the exact, final terms are less significant.

### 2. *"Discussed for Purposes of Implementation"*

██ This element "recognizes that a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits.... Consideration becomes serious when the subject turns to the practicalities of implementation." *Fischer II*, 96 F.3d at 1540. The precise date when this element of the test was satisfied is difficult to determine on the record before us. On remand, the district court should focus its inquiry on the content of the various SPOSA options as initially formulated by the OES Team and on what the various reviews by EUSA and Exxon senior management entailed to determine when the subject turned to the practicalities of implementation. As we discuss below, once the relevant senior management began to address how the various proposals would be implemented within the Production Department, this element would have been satisfied.

### 3. *"By Senior Management with Authority to Implement the Change"*

██ This final element is intended to ensure "that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy.... Until senior management addresses the issue, the company has not yet seriously considered a change." *Fischer II*, 96 F.3d at 1540. The relevant senior managers are "those executives who possess the authority to implement the proposed change." *Id.* However, the *Fischer II* court cautioned that this "should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits

packages." *Id.* Instead, the court held, "[i]t is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations." *Id.*

██ This caution applies equally to a setting like the present one, in which the proposal only affects a division within a larger corporate structure and the corporation may function similarly to a board of directors.[8] The fact that Exxon Corporation may be the only corporate body that "in a literal sense" can implement benefits changes by placing its imprimatur on a proposal from EUSA management should not necessarily push back the date of serious consideration in this case to the date on which the SPOSA proposals landed on desks at Exxon. If EUSA's relationship to Exxon resembles a corporation's relationship to its board of directors, then serious consideration by EUSA's senior management would be sufficient to satisfy the *Fischer II* test.

██ The American Law Institute's *Principles of Corporate Governance* are instructive concerning the relationship between a corporation and its board of directors, and their respective functions and responsibilities. Insofar as relevant here, the role of the board is to "oversee" or "monitor" the conduct of the corporation's business and to approve major corporate plans and actions. *See* American Law Inst., *Principles of Corporate Governance: Analysis and Recommendations* §§ 3.01, 3.02(a)(1)-(2) (1994); *id.* § 3.02 cmt. a (stating that a board can satisfy its duties "without either actively managing or directing the management of the corporation, as long as it oversees management and retains the decisive voice on major corporate actions"); *id.* § 3.02 cmt. d ("In the publicly held corporation, the management function is normally vested in the

---

**8.** Although we deal here with the relationship between a corporation and its division, the

following analysis would be equally applicable in the parent/subsidiary context.

principal senior executives."). A corporation may be actually managed by its senior executives with a substantial degree of delegated authority and autonomy. The management function, in turn, may be delegated to various other senior executive officers, either formally or by course of conduct. *See id.* § 3.01 & cmt. c (noting that such delegation may come either from the board or from the principal senior executives); *see also id.* §§ 1.27, 1.30, 1.33 (defining "officer," "principal senior executive," and "senior executive," respectively). Accordingly, the corporation acts like a board of directors when its general role is limited to one of oversight over its divisions, even if the corporation "retains the decisive voice on major [division] actions." In turn, a division acts like a self-managed corporation when it has been delegated substantial autonomy over its own management decisions.

This distinction between oversight and management is critical in determining the level of autonomy enjoyed by a corporate division for purposes of *Fischer II.* It is difficult to draw precise lines in this context because relationships within corporate structures vary widely. Nonetheless, the focus should be on whether, under the particular corporate structure, the division is essentially self-managed whereby the corporation allows (by policy or by practice) the senior division executives to develop and implement policies for the division as part of their delegated authority, subject to oversight and input from the corporation. The issue is not ultimate authority, because, like the board of directors, the corporation can "retain[ ] the decisive voice on major corporate actions." *Id.* § 3.02 cmt. a. Instead, the issue is whether the proposed policy is within the scope of the divisional executives' delegated management authority such that the corporation will most likely approve their recommendations. If so, consideration by those division-level senior executives is sufficient to satisfy *Fischer II.*

Although EUSA appears to be a highly autonomous entity within the broader Exxon corporate structure, the record on this issue is not fully developed. On remand, the district court should determine whether EUSA was, in fact, essentially self-managed. Specifically, the district court should assess whether Exxon's role in EUSA's business operations was actively managerial or characterized more properly as one of oversight. Relevant to this issue is whether Exxon regularly required changes in the policies referred to it for approval, and whether Exxon regularly initiated suggestions for change in EUSA's personnel and other management policies once they had been put in place. A requirement of Exxon approval prior to implementation of policies is not, in and of itself, any more dispositive than was the need for approval by the board of directors in *Fischer II.* Exxon's retention of some degree of oversight does not necessarily detract from EUSA's ability to make its own managerial decisions. If the fully developed record reveals that EUSA was self-managed, then the third prong of *Fischer II* would be met when the senior management of EUSA began seriously considering the SPOSA proposal.[9]

As the *Fischer II* court cogently stated, the goal of the serious consideration test is for "[e]mployees [to] learn of potential changes when the company's deliberations have reached a level when an employee should reasonably factor the potential change into an employment decision." *Id.* at 1541. Consequently, even though a self-managed corporate division may not be authorized to implement changes without approval, when senior management of such a division is seriously considering an offer of special severance benefits, an employee such as Bins, who is considering retirement and has inquired about possible

---

9. On this record, it appears that Peery, the EUSA Vice–President of the Production Department, might be one of the relevant senior EUSA executives. He had overall responsibility for the management of the affected department, and EUSA's counsel identified him as a senior manager with the authority to carry out the SPOSA offering once it had been approved by Exxon.

changes, obviously would factor that possibility into his decision-making process.

The district court granted summary judgment in favor of EUSA based on its conclusion that serious consideration did not begin until January 26, 1996, when Exxon's senior management reviewed the proposals. Summary judgment on this basis was improper because the district court did not examine Exxon's corporate structure to determine the relationship between Exxon and EUSA and the latter's level of autonomy. If EUSA was a self-managed division, EUSA's senior management's serious consideration of the SPOSA offering would trigger the fiduciary duty to respond truthfully to Bins' inquiries and inform him of the status of the potential SPOSA offering.

### C. The Scope of a Fiduciary's Duties

Bins argues that beyond EUSA's duty to respond truthfully to his inquiries, it had a duty both to notify him if serious consideration began after he made his inquiries and to volunteer information to all potential retirees even in the absence of specific questions. We hold that no such affirmative duties exist except to the extent they are agreed to by an employer.

 The act of amending, or considering the amendment of, a plan is beyond the power of a plan administrator and thus is not an act of plan management or administration. See Varity, 516 U.S. at 505, 116 S.Ct. 1065. Consequently, an employer's serious consideration of a change to a plan does not, in and of itself, implicate ERISA's fiduciary duties. But when an employer communicates with its employees about a plan, fiduciary responsibili-

ties come into play. See id. at 501, 116 S.Ct. 1065 ("Conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose."). If an employee makes an inquiry (or inquiries) about prospective plan changes, the employer's fiduciary duty is to respond completely and truthfully about the present state of affairs—that is, whether serious consideration has begun. The employer's duty does not extend to employees who do not inquire about potential plan changes, however. We hold that, absent such an inquiry, an ERISA fiduciary does not have an affirmative duty prior to final approval and general dissemination of plan changes to volunteer information to employees who have not specifically alerted the fiduciary to the fact that such information is material to them. Cf. Pocchia v. NYNEX Corp., 81 F.3d 275, 279 (2d Cir.1996) ("While NYNEX had a fiduciary duty not to make affirmative misrepresentations or omissions, it did not have a duty to disclose proposed changes in the absence of inquiry by Pocchia.").[10]

 A more difficult question concerns employees who inquire and who are correctly told at that time that no serious consideration has occurred: If the employer subsequently reaches the serious consideration stage, does it have a duty to go back and inform those employees who had previously inquired and who the employer knows have not yet retired? The answer turns on the precise content of the employee's inquiry.

---

**10.** By our holding, we do not question the existence of other "affirmative" disclosure duties of an employer-fiduciary under circumstances not present here. See, e.g., Farr v. U.S. West Communications, Inc., 151 F.3d 908, 914–15 (9th Cir.1998) (finding a breach of fiduciary duty when fiduciary provided information regarding tax consequences of electing an early retirement option, but left out known facts regarding possible adverse tax consequences); Barker v. American Mobil Power Corp., 64 F.3d 1397, 1403 (9th Cir.

1995) (holding that an ERISA fiduciary has a duty to investigate suspicions he has with respect to plan funding and maintenance, and that failing to convey information concerning those suspicions when responding to participants' inquiries can be construed as an affirmative misrepresentation); Acosta v. Pacific Enters., 950 F.2d 611, 619 (9th Cir.1991) (holding that "an ERISA fiduciary has an affirmative duty to inform beneficiaries of circumstances that threaten the funding of benefits").

If an employee, in the course of inquiring about possible plan changes, asks to be kept abreast of any changes in the status of a potential change and the employer provides assurances to that effect, then the employer will have a fiduciary duty to follow up with that employee. In such a situation, the employer should know that silence on its part thereafter conveys an implicit message that no serious consideration has occurred and that the employee will rely on that silence to his or her detriment. *Cf. Varity*, 516 U.S. at 505, 116 S.Ct. 1065 (noting that "plan administrators often have, and commonly exercise, discretionary authority to communicate with beneficiaries about the future of plan benefits"); *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir.1993) ("Th[e] duty to inform ... entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.").

We decline, however, to impose on employers a duty to follow up an employee's inquiry in the absence of an assurance from the employer that it will provide an update. Such a requirement would extend an ERISA plan administrator's fiduciary duty beyond conveying truthful information and any discretionary duties it has assumed, and thus would be inconsistent with *Varity*. No other court has so extended a fiduciary's duty to disclose. Contrary to Bins' suggestion, *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747 (D.C.Cir.1990), does not go so far. *Eddy*'s broad dictum that "[a] fiduciary has a duty not only to inform a beneficiary of new and relevant information *as it arises*, but also to advise him of circumstances that threaten interests relevant to the [fiduciary] relationship," *id.* at 750 (emphasis added), refers to examples where the employer's mere acquisition of information independently gives rise to fiduciary obligations, such as when the fiduciary has "knowledge of prejudicial acts by an employer—such as the failure of an employer to contribute to a fund as required," *id.*, or "when an ineligible person contributes to a fund" and the fiduciary knows or learns of the ineligibility, *id.* at 751. In contrast, an employer's arrival at the serious consideration stage does not independently give rise to a fiduciary obligation to volunteer information in the absence of an inquiry.

Accordingly, in the absence of a promise to update an employee, an ERISA fiduciary's duty does not extend beyond giving complete and accurate answers to the employee's questions. A contrary rule would invite a process whereby employees would include boilerplate requests to be updated whenever they made an inquiry. Such a rule would force upon the employer a responsibility which it may be unwilling to assume and could, consequently, discourage employers from seriously considering otherwise beneficial plan changes. If, on remand, Bins can provide evidence that any of the EUSA representatives he asked about the potential SPOSA change promised to let him know if anything changed, then, assuming serious consideration occurred before his retirement decision became irrevocable, that promise would be a basis for recovery.

**REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

FERNANDEZ, Circuit Judge, with whom O'SCANNLAIN and McKEOWN, Circuit Judges, join, concurring and dissenting:

I agree with parts A and C[1] of the majority opinion and with part B to the extent that it holds that the proper test for answering employee inquiries is the serious consideration test.[2] However, I can-

---

1. Without meaning to be unduly captious, I, however, must indicate that nothing in this record suggests a determination that some special promise to disclose information as it developed was made to Bins by any representative of the employer. I see no reason to remand on that basis. *See* maj. op. 1053 and 1054.

2. *See Fischer v. Philadelphia Elec. Co..* 96 F.3d 1533 (3d Cir.1996) (*Fischer II* ).

not agree with the gloss it puts on the test and especially disagree with the gloss on the "senior management" element of *Fischer II*, 96 F.3d at 1539, which in turn induces it to return this case to the district court for further, perhaps extensive and expensive, proceedings. That, itself, would not be so bad, although it is drear enough. However, it also portends ill for employers, who seek to know when they must disclose plans which are only a-hatching at best.[3]

As *Fischer II* put it, the serious consideration test consists of three elements: "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Id.* The majority's discussion of parts (1) and (2) of the test is troubling. It seems to suggest that when lower echelon employees look at a mere mix of possible options submitted by their underlings, that can be sufficient to satisfy the first two parts of the test. *See* maj. op. at 1050–51.[4] But most troubling, and my focus here, is part (3) of that formulation. *See* maj. op. 1051–53.

As *Fischer II* explained it, part (3) of the test was designed "[to focus] on the proper actors within the corporate hierarchy." *Id.* at 1540. And by senior management *Fischer II* really meant "senior." It noted that corporations, "employ individuals, including middle and upper-level management employees, to gather information and conduct reviews." *Id.* Clearly, those were not the people intended. Certainly, *Fischer II* meant to exclude anyone who did not "possess the authority to imple-

ment the proposed change." *Id.* That would exclude most employees, including some executives who might be part of senior management. On the other hand, while it did not mean to ascend as high as the board of directors itself, it did mean to ascend to the heights of "senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations." *Id.; see also Hockett v. Sun Co., Inc.,* 109 F.3d 1515, 1524 (10th Cir.1997). In other words, it was considering the very highest level of corporate management, but even further limited that to those high-level executives with benefits responsibility. It referred to people who were directly responsible to the board of directors of the company. Those are the people whom the board is most likely to rely heavily upon, and whose recommendations the board is least likely to deviate from.

That test might be difficult enough to apply in some circumstances.[5] I see no reason to make it immeasurably more difficult by asking ourselves questions like: If the board of directors has delegated final decision-making authority to the true senior managers of the company, does senior management become a constructive board, while lower echelon employees become constructive senior management? Once we do that, we commit ourselves to an endless progression of questions of that nature. Especially is that true if we resort to puzzling over the test and begin asking ourselves in the abstract what the

---

3. *Fisher II* itself is far from perfect, if employers of good will are to be encouraged to undertake "the formation of employee benefit plans." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987). But I agree that we should accept it faute de mieux.

4. That seems to reify a spirit lurking within the formulation, which may tend to make *Fischer II* a mere ingredient in some sort of indeterminate mix. *See* maj. op. 1049–50. That, surely, would give litigants and courts more flexibility, but it would hardly help employers to plan their affairs.

5. I recognize that there might, someday, be a case where an ill-disposed company will manipulate its structure in order to give itself the ability to make misrepresentations to its employees with apparent impunity. Should that eventuate, I am certain that the courts will be able to deal with the problem. Suffice it to say that any rule of law can be placed under pressure by the ill disposed; that does not mean that we should make every stated rule mushy. *Cf. Vartanian v. Monsanto Co.,* 131 F.3d 264, 272 (1st Cir.1997). In any event, there is no indication that any manipulation affecting Bins occurred in this case.

clause "authority to implement" is meant to accomplish, rather than seeing that phrase for what it is, viz, a limitation of the class of senior managers rather than an expansion to some class below the level of top management. We judges can live with the uncertainty, but we really should not have to do so. Companies must live with it, but they really should not have to do so.

Nor is the difference between the approach of *Fischer II* and the majority inconsequential. Here, for example, we know that EUSA was a mere division of Exxon. It was not a subsidiary and did not have its own board of directors. The titles or reviewing activities of the employees within that division should be of no real import. None of them were the senior managers of the *company*.[6] We also know that the actual senior managers of Exxon did not give serious consideration to the SPOSA until January 26, 1996 at the earliest.[7] By that time, it was too late for Bins because he never asked a question after that date. True enough, EUSA officers had considered the change before that, but, again, they surely were not people who had the authority to go forward with anything. Just as surely, they were

not the ones who were at the board-reporting level of the company. Clearly, then, they were not the ones to whom *Fischer II* referred. Again, I see no reason to expand the class beyond and below that set forth in *Fischer II*. The lofty position of the senior management class of executives serves to assure us that consideration of a plan has reached a truly serious level in a way that little else could.

Nor will it do to begin ruminating about whether the EUSA employees "resembled" senior management because, perhaps, the real senior management not only "resembled" a board of directors, but also acted as a mere overseer for a significantly autonomous or self managed division, whatever that means.[8] Of course, I recognize that common law adepts are able to define anything at all into something else entirely. There is no good reason to do so here, and once we start down that path, I see no principled way to distinguish among divisions, departments, or even far flung groups that operate pretty independently on a day-to-day basis.[9] More to the purpose, there is not the slightest hint in the record that the Exxon corporate officers were rubber stamps for EUSA.[10] In fine,

---

**6.** That, of course, includes Peery, the EUSA Vice-President of the Production Department. *See* maj. op. 1052 n. 9.

**7.** That might well be too early—its earliness being unsupported in the record—because the record suggests a later date. But Exxon essentially adopts that date and certainly does not argue otherwise. Thus, for purposes of this appeal Exxon must be held to that. *See Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss),* 67 F.3d 1394, 1402 (9th Cir.1995); *Doty v. County of Lassen,* 37 F.3d 540, 548 (9th Cir.1994).

**8.** Perhaps it simply means that a board of directors puts great reliance upon its chief executive officers, and senior management might have put great reliance upon individuals at EUSA. If so, I still see no reason to destabilize the test by reading it that way. Indeed, do we even dare say that senior management is significantly independent and self governing vis-a-vis the board of directors?

**9.** The majority does engage in a somewhat elaborate rumination upon the ALI's explica-

tion of the allocation of power between boards of directors and management. But that cannot conceal the fact that what the majority is doing is turning senior management of a corporation into a quasi board of directors, and lesser management into quasi senior management. The discussion does spread a distractingly diaphanous cloak over that dangerous determination, but it is no less disturbing to those who wish to, or must, see through that diaphragm and deal with the dragon beneath. Again, legally and factually speaking "subsidiary" and "division" are as different as "corporate entity" and "corporate employee," or, if you will, chalk and cheese.

**10.** Neither A. Beg, the human resources manager of EUSA, nor W.M. Snow, the human resources operations manager of EUSA, saw Exxon management as a rubber stamp. Nor did they have authority to do anything without the approval of that management and its authorization. Nothing in the record is to the contrary, but we now send the case back to see if Bins can develop something.

*Fischer II* injects enough uncertainty into this area of the law, but some uncertainty is inevitable when we are attempting to decide just when a misrepresentation has been made to an inquiring beneficiary of a plan. I see no reason to exacerbate the inevitable with the unnecessary; I see no reason to add this new peril to the already parlous ERISA seas.

Thus, while I concur in the adoption of the serious consideration test, I respectfully dissent from the glosses which the majority puts on that test, and which, in turn, result in the remand of this case.[11] In fine, I would affirm the decision of the district court.

11. This would not, of course, foreclose potential relief in a situation where a corporation itself has vested decision making for the benefit change at issue in members of management below the most senior rank. Because of that possibility, there may be circumstances where a trial is necessary to determine whether a proposed change was under serious consideration by an appropriate officer. Nor, as indicated in footnote 5, does this preclude a claim that a company improperly invoked its corporate structure as a fig leaf to avoid disclosure obligations. Again, the record here demonstrates that this case simply does not fall into either category.