Nancy WAYNE; Mary Ann Acaldo; Barbara Garvin; Karen Kendrick; Doris Ryan; Carol Jane Tidwell, Plaintiffs–Appellants,

v.

**PACIFIC BELL, a corporation; Pacific Telesis Group, Defendants–Appellees.**

No. 97–56456.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1999

Filed Aug. 30, 1999

Amended Feb. 8, 2001

A. Kendall Wood, Marc S. Schechter, and Courtney A. Barnes, Hinchy, Witte, Wood, Anderson & Hodges, San Diego, California, for the plaintiffs-appellants.

R. Bart Kimball, Jonathan L. Daniel, and William E. Matsumura, Pacific Telesis Legal Department, Los Angeles, California, for the defendants-appellees.

Before: D.W. NELSON, FERNANDEZ, and W. FLETCHER, Circuit Judges.

### ORDER

This court's opinion, filed August 30, 1999 is hereby amended. The amended opinion is filed simultaneously with this order.

The panel has voted to deny the petition for rehearing filed September 13, 1999. Judges Fernandez and W. Fletcher have voted to deny the petition for rehearing en banc and Judge D.W. Nelson so recommends.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for rehearing and the petition for rehearing en banc are DENIED.

**1.** This memorandum follows the practice of the parties and treats Pacific Bell and its parent holding company Pacific Telesis Group

### OPINION

WILLIAM A. FLETCHER, Circuit Judge:

Plaintiffs are six former Pacific Bell employees who claim their employer induced them to retire under an early retirement incentive program by failing to disclose in response to questions that it was seriously considering offering a more favorable program, and, in addition, by actively misinforming them about the potential availability of such a program. Plaintiffs appeal from the district court's order granting summary judgment for defendants Pacific Bell and Pacific Telesis Group (collectively "Pacific")[1] on their claim for equitable relief for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"). We have jurisdiction under 28 U.S.C. § 1291. We reverse and remand.

We held in *Bins v. Exxon Company, U.S.A.,* 220 F.3d 1042 (9th Cir.2000) (en banc), that when an employer-fiduciary begins to give "serious consideration" to an amendment of a retirement or severance program, it has a fiduciary obligation to communicate with plan participants and beneficiaries. It need not volunteer information, but when asked a question by a participant or beneficiary "the employer's fiduciary duty is to respond completely and truthfully about the present state of affairs—that is, whether serious consideration has begun." *Id.* at 1053. In that circumstance, the employer-fiduciary must "communicate the potential amendment accurately and straightforwardly." *Id.* at 1048.

In addition, we adopt in this case the rule followed by the Second Circuit that an employer-fiduciary "may not actively misinform its plan beneficiaries about the availability of future retirement benefits to induce them to retire earlier than they otherwise would, regardless of

as one entity. Neither defendant disputes that it is a Plan fiduciary.

whether or not it is seriously considering future plan changes." *Ballone v. Eastman Kodak Co.,* 109 F.3d 117, 124 (2d Cir.1997).

Applying the *Bins* rule requiring honest answers to questions once serious consideration has begun, and the *Ballone* rule against actively providing misinformation even prior to serious consideration, we hold that defendant Pacific was erroneously granted summary judgment.

## .I

Pacific was plaintiffs' employer and a fiduciary of the ERISA pension plan (the "Plan") in which plaintiffs participated. According to plaintiffs, Pacific misrepresented the Plan's financial stability, required plaintiffs to accept or reject an Early Retirement Incentive program (the "ERI II") during June 1995, and failed to disclose during that month that it was seriously considering a proposal to implement a more favorable Early Retirement Benefit program (the "ERB").

On approximately June 1, 1995, Pacific announced the ERI II, a so-called 4 + 4 early retirement incentive program. The ERI II provided an incentive to retire by adding four years to a person's age and four years to the actual number of years of service for purposes of determining eligibility, thereby enabling a younger person with less experience to retire early without a penalty in the amount of pension benefits. Pacific required plaintiffs to accept or reject the ERI II offering during a one-month window between June 1 and June 30, 1995. Employees who agreed to retire under the ERI II were required to retire on July 15, 1995. Plaintiffs each signed an Election and Agreement to Retire under the ERI II ("Agreement"). The Agreement did not permit plaintiffs to revoke their decisions to retire after June 30, 1995, the last day of the election period.

Pacific and plaintiffs' union, the Communications Workers of America (the "Union"), negotiate a new collective bargaining agreement every three years. Pacific and the Union had agreed to the terms of the ERI II as part of the August 1992 Collec-tive Bargaining Agreement (the "1992 CBA"). Until August 5, 1995, the termination date of the 1992 CBA, Pacific was permitted to offer only early retirement incentive programs included in the 1992 CBA, such as the ERI II. Plaintiffs contend that, beginning in approximately December 1994, and continuing through June 1995, Pacific misrepresented the Plan's financial status and the likelihood that Pacific would offer an enhanced benefit program under the upcoming August 1995 Collective Bargaining Agreement (the "1995 CBA").

During that time period, plaintiffs received mass voice-mail messages at work identifying senior managers who had been laid off, explaining that the marketing department needed people in other units to sell Pacific Bell services to neighbors and friends, and telling employees to save money on office supplies. Paulette Rennie, a first-level manager, told plaintiff Nancy Wayne that Pacific's financial prospects looked "gloomy." In May 1995, second-level managers Mike Lynch and Jim Ostrich held a floor meeting in plaintiffs' section and told them that the company was in bad financial condition and that they anticipated Pacific would lose 30 percent of its business customers once competition in the industry took effect. Lynch and Ostrich explained that for the first time in history shareholders might not receive dividends on their stock and that Pacific was going to have to cut 10,000 employees in five years.

At a June 1, 1995 meeting informing plaintiffs of the ERI II offer, management representatives stated in response to employee questions that "no additional monies would be available to make another early retirement offer." Plaintiff Mary Ann Acaldo recalls attending a meeting at which Pacific representatives, including Diane Raynor, the Pacific human resources manager responsible for disseminating information about the ERI II, answered employee questions about the ERI II. According to Acaldo, one of the people

running that meeting stated that no retirement offers with enhanced benefits would be forthcoming.

During this period, plaintiff Acaldo was told by her supervisor that her job might be in danger. At some point after the ERI II offer, Acaldo stopped second-level manager Mike Lynch in the hall. She told him she had heard rumors that a better early retirement offer might be made in the future, and she asked whether he thought that might be possible. Lynch responded, "Mary Ann, you're the smart one. All these other people are waiting for a bonus or for extra money. There is never going to be any money. This company can't afford to pay any money." Acaldo told all of the other plaintiffs what Lynch had said to her. Plaintiff Karen Kendrick asked her supervisor whether any better offers were going to be made and was told she "shouldn't count on it." Plaintiff Doris Ryan's manager told her she was eligible for the ERI II and suggested it would be a good idea to take the offer. Ms. Ryan concluded from this, and from her sense of Pacific's financial situation, that she had no choice but to take the offer because otherwise she would be "gone with nothing."

A June 6, 1995 in-house newsletter included a "State of the Business" column with responses by Pacific's executive vice president to employee questions about downsizing.[2] In that column, the executive vice president explained that it was "too early to tell" what cost-saving measures would be implemented in addition to workforce reduction and that "the next two or three years [would] be very challenging." The column also included the following question and answer:

Q. *We have heard rumors of another early out, comments?*

A. This is questionable due to two factors, the declining surplus in the pension fund and the dilemma of incenting (sic) good people to leave. Last years (sic)

decision to utilize involuntary management force adjustment plan will stand. The executive vice president's answer stated that the surplus in the pension fund was drying up and suggested that there would not be enough money in the fund in the future to offer early retirement incentives more favorable than the ERI II. In truth, however, Pacific's actuarial services group had concluded that the pension fund would be overfunded by 1.6 billion dollars by the year 2000 if Pacific did nothing to deplete the surplus. The answer also contained an implicit threat that employees who did not accept the current "early out" (the ERI II) ran the risk of being subjected to the "involuntary management force adjustment plan"—*i.e.*, in plain English, ran the risk of being fired.

Sometime between late 1994 and early 1995, Pacific's labor relations committee developed an internal proposal to offer an enhanced early retirement program. That proposal was submitted to a high-level steering committee to prepare for the 1995 collective bargaining sessions with plaintiffs' Union. Pacific and the Union began formal collective bargaining for the 1995 CBA on June 13, 1995.

On June 15, the Union submitted Union Proposal No. 28, which noted that the Plan was "very healthy" and "greatly overfunded," and proposed a new 6 + 6 early retirement incentive with a cash incentive of one year's pay and additional financial benefits (the "6 + 6 proposal"). On June 16, Pacific countered with a Cash Balance Pension proposal. Unlike an early retirement program such as the ERI II or the Union's 6 + 6 proposal, the Cash Balance Pension proposal would have amended the Plan to allow Pacific to lay off employees rather than requiring it to keep earlier job security commitments. Under the Cash Balance Pension proposal, an employee not yet at retirement age would have been entitled to "cash out" the balance accrued

---

**2.** Pacific asserted at oral argument that the newsletter was distributed by an employee and not by Pacific. While the origin of the

newsletter may be disputed, Pacific does not dispute that such statements were made to employees by Pacific management.

toward his or her pension rather than leaving Pacific with no pension benefits at all. The Union rejected this proposal.

On June 19, Pacific proposed a "Downsizing Program," which included an enhanced 4 + 4 Early Retirement Benefit program that included 20 percent supplemental payments through age 62 (the "proposed ERB" or "ERB proposal"). The proposed ERB also included an option to cash out the 20 percent supplemental payments, in effect providing an up-front cash incentive. The terms of the Union's June 15 6 + 6 proposal and of Pacific's June 19 ERB proposal were both more favorable to employees considering retirement than the terms of the existing ERI II.

Pacific and the Union ultimately agreed to amend the Plan by creating a new ERB consisting of a 4 + 4 early retirement program with a 30 percent supplement (an increase from the 20 percent supplement in Pacific's initial ERB proposal). Compared to the ERI II, the new ERB contained an approximate increase of 13–14 percent in pension benefits and 30 percent supplemental payments through age 62, with an option to cash out the supplemental payments. On August 8, 1995, Pacific and the Union formally agreed to the 1995 CBA, which included the new ERB.

In October, Pacific offered the new ERB to employees in plaintiffs' former work group.[3] If plaintiffs had retired under the new ERB offered to their work group in October rather than under the ERI II, they each would have been entitled to additional pension benefits with cash values ranging from $26,962.74 to $99,241.38.

Plaintiffs sued Pacific in federal district court, seeking relief for alleged breach of fiduciary duty under ERISA, see 29 U.S.C. §§ 1104 and 1132(a)(2) & (3), benefits due

under ERISA, see 29 U.S.C. § 1132(a)(1)(B), and declaratory relief.[4] Pacific moved for summary judgment. The district court found that Pacific had "advertised that its financial health was poor, that downsizing was inevitable, and that the surplus in the pension plan was drying up." It also found that plaintiffs had asked their supervisors whether better early retirement incentives would be offered in the future, but that their supervisors had told them there would be no better offers. Nevertheless, the district court held Pacific had not actively misinformed the employees in order to induce them to retire earlier because the final outcome of negotiations between Pacific and the Union was uncertain until collective bargaining was completed.

The district court held that Pacific had a duty to disclose material information to plaintiffs once plans to implement improved benefits were under "serious consideration," but the court concluded that serious consideration could not take place until collective bargaining resulted in a binding CBA. In addition, the district court held that Pacific was not permitted to communicate with individual employees during collective bargaining about potential terms of a future early retirement program because such communications would have interfered with the Union's role as the employees' exclusive bargaining agent.

■ The district court granted summary judgment for Pacific. We review de novo. See Williams v. Caterpillar, Inc., 944 F.2d 658, 661 (9th Cir.1991).

## II

· Pacific does not dispute that as an employer-fiduciary it has a fiduciary duty un-

---

**3.** It is not clear from the record whether Pacific and the Union later negotiated a modified version of the new ERB and offered that negotiated ERB to plaintiffs' work group. However, it is undisputed that both the new ERB and the "negotiated ERB" (if one existed) provided enhanced benefits as compared to the ERI II. For ease of reference, we will refer to the ERB offered to plaintiffs' work group simply as the new ERB.

**4.** Plaintiffs originally asserted several state law claims in addition to their ERISA claims. Plaintiffs have dismissed those state law claims pursuant to stipulation.

der ERISA. As soon as an employer-fiduciary gives serious consideration to a proposal to change retirement benefits, it has a duty to disclose, in response to inquiries, information about the proposal to plan participants and beneficiaries. *See Bins*, 220 F.3d at 1048–49. Further, even before serious consideration begins, an employer-fiduciary has a duty not to actively misinform its employees in an attempt to induce them to retire earlier than they otherwise would. *See Ballone*, 109 F.3d at 124.

### A

▪ To determine when an employer has begun serious consideration of a change in ERISA benefits, we use the framework established by the Third Circuit in *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533 (3d Cir.1996) (*"Fischer II"*), as adopted and explained in our en banc decision in *Bins*. Once serious consideration has begun, an employer-fiduciary must respond to questions "accurately and straightforwardly." 220 F.3d at 1048. It is unclear on this record precisely when serious consideration began, but it is at least clear that it had already occurred when Pacific presented its proposed ERB to the Union during collective bargaining on June 19, 1995. At that point, the proposal had been prepared by Pacific's labor relations team; had been reviewed by a high-level steering committee; and was offered to the Union by a Pacific representative with authority to bind Pacific to its terms. Pacific nonetheless contends that the proposal had not been seriously considered by June 19 because it had not yet been accepted by the Union. We disagree.

Addressing a similar argument in *Drennan v. General Motors Corp.*, 977 F.2d 246 (6th Cir.1992), the Sixth Circuit rejected an argument by General Motors ("GM") that because GM could not change separation benefits without the union's approval it had no fiduciary duty to disclose information about the proposed change. *See id.* at 252. The Sixth Circuit concluded that information about the proposed change was material to the interests of

employees who were deciding whether to accept the terms of another GM separation plan for which they were already eligible: "[I]t was GM's serious consideration of the plan, rather than the union's approval of the plan, that triggered its fiduciary duties." *Id.* Consequently, GM had a fiduciary duty to provide participants accurate and straightforward responses to questions about the proposed change despite the fact that collective bargaining had not yet been concluded. *See id.*

We adopt the reasoning of the Sixth Circuit and hold that whether the CBA had ultimately included Pacific's ERB proposal is not determinative of the question whether Pacific had given it "serious consideration" under *Bins*. The Union's approval of the proposal, and thus a high standard of certainty that it would be implemented, is not required. A guarantee of improved retirement or severance benefits is, of course, material to an employee contemplating retirement; but the reasonable probability, or even the realistic possibility, of improved benefits is also material to such an employee.

▪ An employer is free to engage in business activities without violating its fiduciary duties under ERISA, and to assert its business interests in collective bargaining. But the fact that an employer-fiduciary has no obligation to bargain in its employees' interests, *see Lea v. Republic Airlines, Inc.*, 903 F.2d 624, 631 (9th Cir. 1990), does not mean that it is free during a period of collective bargaining, or in anticipation of such bargaining, to withhold information from plan participants in violation of its fiduciary duty under ERISA. More specifically, we do not believe that ERISA's disclosure requirement necessarily conflicts with an employer's obligation not to bargain with individual employees. *See generally* 29 U.S.C. § 159(a) (providing that designated bargaining representatives shall be exclusive employee representatives for purposes of collective bargaining).

Pacific relies on *National Labor Relations Board v. Baltimore News Am. Div.*, 590 F.2d 554 (4th Cir.1979), in which the Fourth Circuit held that an employer is not entitled to offer enhanced retirement and pension benefits to individual employees unilaterally without the approval of their bargaining agent. *See id.* at 556. In *Baltimore News*, however, the employer offered the enhanced early retirement program directly to individual employees after reaching a bargaining impasse with the union over the proposed change. *See id.* at 555. An employer attempting to undermine a union's power to bargain on behalf of its members is a far cry from communicating as a fiduciary about serious consideration of a proposal to change employee benefits under an ERISA plan. *See Adamczyk v. Lever Bros. Co.*, 33 F.Supp.2d 679, 687 (N.D.Ill.1998) (rejecting application of *Baltimore News* where plaintiffs represented by union claimed employer had failed to inform them that it was seriously considering enhanced benefits package).

B

Pacific's fiduciary duty is not confined to providing truthful answers to questions once serious consideration has begun. As a fiduciary, it also has a duty not to actively misinform plan participants and beneficiaries, whether or not there has been serious consideration. "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.' As other courts have held, '[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA.'" *Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (citation omitted).

■ The fiduciary duty not to deceive plan participants and beneficiaries exists at all times, not merely once serious consideration of offering such benefits has begun. We agree with the Second Circuit that, in the context of the possibility of improved retirement benefits, an employer may not "actively misinform" plan beneficiaries about such a possibility in order to induce them to retire early "*whether or not it is seriously considering future plan changes.*" *Ballone*, 109 F.3d at 124 (emphasis added). *See also In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255, 1266–67 (3d Cir.1995) ("The district court's findings that the company actively misinformed its employees by affirmatively representing to them that their medical benefits were guaranteed once they retired, when in fact the company knew this was not true and that employees were making important retirement decisions relying upon this information, clearly support a claim for breach of fiduciary duty under ERISA.").

■ In this case, the district court held that Pacific did not actively misinform its employees because "the final outcome of the [collective] bargaining could not be predicted." The district court's holding is based on a misunderstanding of what it means to actively misinform. A person actively misinforms by saying that something is true when it is not true. But the person also misinforms by saying that something is true when the person does not know whether it is true or not. Under this standard, a reasonable factfinder could conclude that Pacific actively misinformed its employees. There is evidence in the record that Pacific affirmatively represented to its employees that no offer of an improved benefits package would be offered when, in fact, Pacific knew that it would propose such a package to the Union and that there was at least a reasonable probability that some version of the package would ultimately be incorporated into the collective bargaining agreement.

III

■ To determine when the *Bins* duty to disclose arose, the district court must determine, irrespective of the pendency of collective bargaining, the date on which Pacific began "serious consideration" of

improved retirement benefits. After that date, Pacific had a duty to respond "accurately and straightforwardly" to inquiries from its employees. *Bins*, 220 F.3d at 1053. The district must also determine whether Pacific actively misinformed its employees about the availability of improved retirement benefits at any time, even before "serious consideration." *See Ballone*, 109 F.3d at 124. On the current record, neither of these determinations can be made in favor of Pacific on a motion for summary judgment.

We therefore **REVERSE** and **RE-MAND** for further proceedings consistent with this opinion.