Dwight D. MATHEWS; Charles N. Hord; Bill Buchanan; Everett M. Miller; Albert Munn; Tommie Lee Rush, Plaintiffs–Appellees,

and

Issiah Milton; Leroy P. Bateman; Otis C. Joiner; Ernest L. Oliver; Fred Smith; Carolyn Whatley; Raul Tovar; Ronald Morton; Thomas Moungovan; Jesse Ronald Carlock; Joseph S. Piazza; Daniel J. Dreesman; Milan Jerome Rapo, Sr., Plaintiffs,

v.

**CHEVRON CORPORATION, Defendant–Appellant.**

Dwight D. Mathews; Otis C. Joiner; Ernest L. Oliver; Raul Tovar; Bill Buchanan; Joseph S. Piazza; Everett M. Miller; Albert Munn; Tommie Lee Rush; Milan Jerome Rapo, Sr., Plaintiffs,

and

Issiah Milton; Leroy P. Bateman; Fred Smith; Carolyn Whatley; Charles N. Hord; Ronald Morton; Thomas Moungovan; Jesse Ronald Carlock; Daniel J. Dreesman, Plaintiffs–Appellants,

v.

Chevron Corporation, Defendant–Appellee.

Nos. 02–15936, 02–16209.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 14, 2003.

Filed March 26, 2004.

Howard Shapriro, Shook, Hardy & Bacon, New Orleans, LA, for the defendant-appellant/appellee.

Thomas G. Moukawsher, Moukawsher & Walsh, Groton, CT, for the plaintiffs-appellees/appellant.

Michael P. Doyle, Gary K. Stearman, Department of Labor, Washington, DC; Mary Ellen Signorille, AARP Foundation, Washington, DC, for the amicus curiae.

Before: WALLACE, O'SCANNLAIN, Circuit Judges, and BEISTLINE, District Judge.*

---

* The Honorable Ralph R. Beistline, United States District Court Judge for the District of Alaska, sitting by designation.

---

WALLACE, Senior Circuit Judge.

At issue here is an alleged violation of section 404(a)(1) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1104(a)(1), and the equitable relief awarded pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3). Chevron Corporation (Chevron) appeals from the injunction requiring it to modify its retirement plan records to reflect that six plaintiffs were involuntarily terminated by Chevron Product Company's Richmond, California, Refinery (Richmond) and thus eligible for payment of a "Special Involuntary Termination Enhancement" (SITE) benefit. Eight plaintiffs who were denied relief—four pursuant to pre-trial summary judgment and four following trial—cross-appealed.

The district court's jurisdiction was based on 29 U.S.C. § 1132(e). We have jurisdiction over Chevron's timely appeal and the timely cross-appeal pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.

I.

As part of an effort to reduce the workforce of its subsidiaries, Chevron officially adopted SITE in an important company-wide "blue-top" announcement on February 23, 1999. SITE provided a benefit enhancement to any Chevron Corporation Retirement Plan participant involuntarily terminated without cause between March 1 and December 31, 1999. Chevron's use of SITE at Richmond is the source of controversy here. Richmond is part of the Refining Division of the Chevron Products Company, an unincorporated division of Chevron U.S.A., Inc., which in turn is a wholly owned subsidiary of Chevron.

Plaintiffs were all "rank-and-file" employees at Richmond whose retirements from Chevron became effective between September 30, 1998, and June 24, 1999.

Although only "involuntarily" terminated employees were eligible for SITE, local management could send their work-force preference letters to solicit expressions of interest in the program. In theory, employees who indicated a desire to be considered for involuntary termination (i.e., those who "self-tapped") would not be guaranteed termination and the consequent benefit. In practice, however, the vast majority of workers who "self-tapped" were involuntarily terminated and received SITE. Indeed, the parties stipulated that had the plaintiffs been "self-tapping" volunteers, they would have qualified.

Despite company-wide availability, the decision whether to send SITE preferences letters—at least as far as Chevron's "rank-and-file" employees were concerned—was made by local management. At Richmond, this authority rested with Bill Steelman, the refinery's general manager. Although Chevron initially adopted SITE, Steelman continued to rely on personnel rearrangements and attrition to improve efficiencies and achieve necessary downsizing. His unwavering mantra had been that, in return for a pledge of cooperation from Richmond's workforce with any downsizing and rearrangements, Richmond would not terminate any employee "involuntarily" except for cause.

Therefore, when Richmond employees inquired about SITE on its "Rumor Buster" website (a forum to submit questions anonymously), Richmond's responses conveyed Steelman's attrition-only edict. The topic of layoff retirement packages was first broached in a posting dated February 19, 1999. Richmond acknowledged that Chevron was developing a "Severance Plan," but explained that, as the decision on its implementation would be made local-

ly, Richmond was "not planning to have a severance package ... [voluntarily or involuntarily] in the foreseeable future" (brackets in original). A March 1, 1999, "Rumor Buster" again recognized the need to reduce the number of Richmond employees, but repeated that the refinery had no "plans" to introduce SITE and that attrition would produce workforce reductions once the refinery could operate safely with fewer employees. Several weeks later, a third "Rumor Buster" reiterated Steelman's belief that Richmond was not yet capable of operating with less employees. Notably, each "Rumor Buster" explicitly stated it expressed Richmond's intentions "at this time." In addition to his "Rumor Busters," Steelman conveyed his resolve not to utilize SITE at Richmond orally during refinery town-hall meetings.

Meanwhile, Steelman faced pressure from his superiors to reduce Richmond's bloated workforce through SITE. Despite Steelman's considerable discretion over Richmond's personnel policies, he still had to report to Lance Gyorfi, a Chevron executive who coordinated employment policies at Chevron's United States refineries via quarterly "Refinery Guidance Team" (Team) meetings and intermittent conference calls. The Team first discussed SITE on February 26, 1999, three days after SITE's unveiling. Gyorfi stated that human resources (HR) personnel and "Group 1" management (over whom Chevron exercised more centralized control) may be offered SITE. The Team attempted, as its members traditionally did, to decide the SITE issue by consensus. During subsequent conference calls, the other five local managers warmed to the idea of utilizing SITE to cut HR employees. Steelman's position did not change, and on March 31, 1999, he obtained the Team's approval to send a letter to a Richmond union communicating the refinery's cur-

rent intent not to use SITE among the union's members.

On April 14, Alan Preston, the general manager of Chevron Products Company HR, sent an e-mail to Steelman and other general managers proposing a plan to offer all HR personnel the option of "self-tapping." Steelman replied that making SITE available only to Richmond's HR staff would contravene his policy of treating all employees equally. Steelman reversed course the next day (April 22, 1999), however, and agreed to mail SITE preference letters to Richmond HR employees. He emphasized, though, that he was not committing himself to respond to their preferences due to his lingering equality concerns.

During a mid-May Team meeting in Pascagoula, Mississippi (mid-May Meeting), the Team decided to extend SITE to all management-level employees over whom they customarily exercised control. Steelman initially objected with regards to those currently stationed in Richmond, but acquiesced since he knew this decision was the Team's to make, not his. At this point, Steelman concluded that he would have to offer SITE universally at Richmond to avoid discriminating against rank-and-file employees. He therefore instructed Richmond's HR manager to notify imminent retirees of the policy change, sent out a formal notice to all employees on May 28, 1999, and scheduled a town-hall meeting to discuss SITE. Since most plaintiffs had already retired, they no longer were eligible for the attractive SITE benefit. This lawsuit ensued.

## II.

■ The interpretation of ERISA is a question of law reviewed de novo. *Shaver v. Operating Eng'rs Local 428 Pension Trust Fund,* 332 F.3d 1198, 1201 (9th Cir. 2003). To establish an action for equitable relief under ERISA section 502(a)(3), 29

U.S.C. § 1132(a)(3), the defendant must be an ERISA fiduciary acting in its fiduciary capacity, *Varity Corp. v. Howe,* 516 U.S. 489, 498, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), and must "violate[ ] ERISA-imposed fiduciary obligations," *id.* at 506, 116 S.Ct. 1065.

## A.

■ It is uncontested that Chevron was and remains the plan sponsor and administrator of the Chevron Corporation Retirement Plan. *See* 29 U.S.C. § 1002(21)(A) (providing that a "person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan . . ., or (iii) . . . has any discretionary authority or discretionary responsibility in the administration of such plan"). On appeal, Chevron challenges the district court's holding "that the misinformation disseminated by Richmond management was done in its role as a fiduciary within the meaning of ERISA." The determination of Chevron's fiduciary status is a conclusion of law, *see Varity,* 516 U.S. at 498, 116 S.Ct. 1065(deeming a "legal conclusion" the lower court's decision that an employer was acting as a fiduciary), that we review de novo. Fiduciary conduct encompasses "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation. . . . To offer beneficiaries detailed plan information in order to help them decide whether to remain with the plan is essentially the same kind of plan-related activity." *Bins v. Exxon Co. U.S.A.,* 220 F.3d 1042, 1048 (9th Cir.2000) (en banc), *quoting Varity,* 516 U.S. at 502–03, 116 S.Ct. 1065.

■ Chevron contends that categorizing their dissemination of SITE-related information as fiduciary conduct would work an

unwarranted expansion of ERISA's obligations. These communications, Chevron alleges, did not pertain to benefit-plan administration, but merely addressed employment matters with some relevance to pension benefits. The Supreme Court in *Varity*, however, rejected a similar argument attempting to "parse[ ] the ... communications too finely." *Varity*, 516 U.S. at 504, 116 S.Ct. 1065. Although one strand of Richmond management's communications concerned employment matters (i.e., the prospect and method of workforce reductions), when taken as a whole and in context, the primary purpose of the statements was to "[c]onvey[ ] information about the likely future of plan benefits" (SITE), and thus "permit[ ] beneficiaries to make an informed choice about continued participation." *See id.* at 502, 116 S.Ct. 1065.

Indeed, the questions posted on the "Rumor Buster" website show Richmond employees were principally interested in the likelihood of a severance package such as SITE, not whether the workforce would face involuntary terminations. For example, Richmond's February 19, 1999, "Rumor Buster" addresses the question "Are there *any plans for a retirement package to be offered* for some of the layoffs and cutbacks?" (emphasis added). The corresponding answer echoes the question's primary concern over "retirement package[s]," and not layoffs, stating in part that "*we are not planning to have a severance package here· at Richmond [voluntarily or involuntarily] .in the foreseeable future.* ... I can confirm that the Corporation is working on some form of Severance Plan." *Id.* (brackets in original). The March 1, 1999, "Rumor Buster" confronted another question involving SITE as a severance package: "Why can't we open up the severance program to all eligible employees? Although I am not close to retirement age, it would be a nice incentive to take the money and market my skills elsewhere."

Once again, the response stressed the benefits package: "the refinery does not have plans to utilize the enhanced Corporate Severance Plan." Finally, a comment posted April 21, 1999, queried:"why is it that Richmond employees who would happily *volunteer to be part of this program* are being excluded?" (emphasis added).

The significance of SITE's enhanced benefit, as opposed to its connection to possible involuntary terminations, was not unknown to Chevron. Once Steelman decided at the mid-May Meeting to offer SITE universally at Richmond, he promptly telephoned the refinery and directed that all employees who were about to retire be informed regarding SITE's pending availability. He hastened to make the call because he wanted imminent retirees to know that they soon might be able to "self-tap" and receive SITE's benefit, not that SITE may have increased the chances of using involuntary· terminations to cut workers.

Given that the obvious concern driving these communications was the availability of SITE benefits, the district court did not clearly err in finding that "*the whole point of the dialogue was to help plan participants make informed choices about plan options.*" Our holding, therefore, is identical to that of *Varity:* "the factual context in which the statements were made, combined with the plan-related nature of the activity, engaged in by those who had plan-related authority to do so, together provide sufficient support for the District Court's legal conclusion that [Chevron] was acting as a fiduciary." *Varity*, 516 U.S. at 503, 116 S.Ct. 1065. In doing so, we need not reach Chevron's contention, on which we express no opinion, that Congress carefully confined ERISA remedies for mere employment communications to 29 U.S.C. § 1140.

## B.

■ Having concluded that Chevron was acting in its fiduciary capacity when it discussed the likelihood of SITE at Richmond, the next inquiry is whether making the statements breached the fiduciary duties imposed by ERISA. *Varity,* 516 U.S. at 506, 116 S.Ct. 1065. In general, the "core obligation of an ERISA fiduciary is to 'discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries.'" *Bins,* 220 F.3d at 1048 (brackets in original), *quoting* 29 U.S.C. § 1104(a)(1). One component of this "core obligation" is the duty not to make affirmative material misrepresentations to plan participants who inquire regarding possible changes in the plan. Two specific formulations of ERISA's fiduciary duty not to provide materially misleading information are alleged to have been violated here.

■ We agree with the district court's position that these determinations are properly characterized as mixed questions of law and fact. *See In re Indian Gaming Related Cases,* 331 F.3d 1094, 1107 (9th Cir.2003) ("A mixed question of law and fact exists where the relevant facts are undisputed and the question is whether those facts satisfy the applicable legal rule."); *James v. Pirelli Armstrong Tire Corp.,* 305 F.3d 439, 449 (6th Cir. 2002) (" 'Whether an affirmative misrepresentation was "material[ ]" is a "mixed question of law and fact." ' " (*quoting Fischer v. Phila. Elec. Co.,* 994 F.2d 130, 135 (3d Cir.1993))); *Hockett v. Sun Co., Inc., (R & M),* 109 F.3d 1515, 1524 n. 3 (10th Cir.1997) ("The question of when 'serious consideration' began is a mixed question of law and fact."); *Mullins v. Pfizer, Inc.,* 23 F.3d 663, 669 (2d Cir.1994) (same); *cf. Fischer v. Phila. Elec. Co.,* 96 F.3d 1533, 1541 n. 3 (3d Cir.1996) (declaring that the court "expressly reserve[s] the question of the appropriate standard of review," although recognizing that it previously described it "as a mixed question of law and fact"). *But see Wilson v. S.W. Bell Tel. Co.,* 55 F.3d 399, 405 (8th Cir. 1995) ("The determination when serious consideration began is a question of fact."). Mixed questions of law and fact are reviewed de novo; however, the underlying factual findings are reviewed for clear error. *Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.,* 259 F.3d 1036, 1042 (9th Cir.2001). As to the latter, we are mindful that "[t]his clearly erroneous standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed' before reversal is warranted." *McClure v. Thompson,* 323 F.3d 1233, 1240 (9th Cir. 2003), *quoting Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001).

### 1. Serious Consideration

■ Plaintiffs assert that Chevron violated the duty to disclose material information that we identified in *Bins:* "when a plan participant inquires about potential plan changes, an employer-fiduciary has a duty to provide complete and truthful information about any such changes then under *serious consideration.*" *Bins,* 220 F.3d at 1045 (emphasis added). "Serious consideration" occurs "when '(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change.'" *Id.* at 1048, *quoting Fischer,* 96 F.3d at 1539. These three "related elements . . . must be analyzed together in an 'inherently fact-specific' review." *Bins,* 220 F.3d at 1048, *quoting Fischer,* 96 F.3d at 1539.

■ Focusing on *Bins's* first issue, the district court determined that Chevron did not generate a "specific proposal" for Richmond's rank-and-file until . the mid-May

Meeting; before then it "was merely 'gathering information, developing strategies and analyzing options' within the meaning of *Bins*." *See Bins*, 220 F.3d at 1050. Plaintiffs argue that Chevron began seriously considering SITE at Richmond much earlier: on February 26, 1999, the day a memorandum proposing refinery-wide implementation coincided with the Team's initial discussion of the matter.

Considering *Bins's* first issue in isolation, we agree with the plaintiffs that a "specific proposal" existed on February 26, 1999. Chevron had moved beyond the "antecedent steps of gathering information, developing strategies, and analyzing options," and had generated something "sufficiently concrete to permit a discussion about implementation." *Id.* (internal quotation marks and citation omitted). Indeed, virtually all of SITE's features, from the benefits offered to the "self-tap" opportunity, had crystallized. The only major aspect of the program yet to be determined was employee eligibility.

■ That lingering unresolved aspect, though, prevents us from concluding *Bins's* second issue was met. That is, although Steelman and the rest of the Team may have discussed various alternatives for making SITE available to HR personnel and various managers, SITE was not "discussed for purposes of implementation" among the rank-and-file at Richmond until the mid-May Meeting. *See Fischer*, 96 F.3d at 1540 (positing that the "second element ... further distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy"); *cf. Vartanian v. Monsanto Co.*, 131 F.3d 264, 272 (1st Cir. 1997) (modifying the first prong of the serious consideration test to require "a specific proposal *which would affect a person in the position of the plaintiff*" (emphasis added)). Before the mid-May Meeting, Steelman steadfastly refused to

consider implementing SITE at Richmond in any form, and the Team initially appeared to respect his position. The Refinery Function's HR manager generated a "Potential Refining SITE Applications (By Group)" chart on March 18, 1999, that not only indicated no SITE terminations were expected at Richmond, but also was explicit that Richmond "[w]ill not use SITE." On March 31, 1999, Chevron approved the letter Steelman planned to send to one of Richmond's unions expressing his intent not to use SITE.

Any departure from Steelman's no-SITE-at-Richmond pledge was confined to the extension of SITE to HR employees. An April 14, 1999, e-mail from Chevron Products Company's HR general manager sought permission to solicit information from potential "self-taps" in the HR sector. Steelman agreed on April 22, 1999, but nonetheless did not agree to act on the preferences.

At the mid-May Meeting, however, the Team overcame Steelman's resistance and decided to implement SITE for HR and other upper-level employees at all refineries. As a consequence, Steelman felt compelled by his equal treatment policy to offer SITE to Richmond's entire workforce. Only upon this mid May Meeting capitulation did "the subject turn[ ] to the practicalities of implementation" at Richmond and surpass the preliminary, deliberative stages. *See Bins*, 220 F.3d at 1051 (internal quotation marks and citations omitted).

■ Our analysis of *Bins's* third issue is implicit in our consideration of the second. Under *Bins*, not only must a "specific proposal" be "discussed for purposes of implementation," but these discussions must be conducted by "senior management with the authority to implement the change." *Id.* at 1048 (internal quotations and citations omitted). In applying this

element, we keep its intended function in mind:"to ensure that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy." *Id.* at 1051 (internal quotation marks and citation omitted). The "proper actor" with the "authority to implement" SITE for Richmond's rank-and-file was Steelman, and he, to repeat, first considered making SITE available at Richmond at the mid-May Meeting. In addition, whereas the Team may have had greater clout over HR and upper-level employees, nothing in the record suggests they sought to override Steelman's plans for the rank-and-file; in fact, the record indicates that Steelman had virtually unchecked authority in this regard. *See id.* at 1052 ("The issue is not ultimate authority. . . . Instead, the issue is whether the proposed policy is within the scope of the divisional executives' delegated management authority such that the corporation will most likely approve their recommendations.").

Since Chevron did not "seriously consider" offering SITE to rank-and-file employees at Richmond until the mid-May Meeting, it follows from *Bins* that if Chevron made a misrepresentation about the likelihood of future plan benefits before then, it was not material and hence not an actionable violation of the ERISA-imposed duty to respond "accurately and straightforwardly" to inquiries from the plaintiffs on Chevron's preliminary plans to offer severance benefits. *Id.* at 1048. We thus disagree with the plaintiffs' argument that the occurrence of *any* SITE-related discussions would certainly be material to Richmond employees given they stood to see the cash value of their retirement benefit packages increase by as much as ten percent.

■ The plaintiffs further contend that Chevron violated a post-serious consideration duty to correct any misinformation Plaintiff Dreesman may have received from his union representative concerning the union's SITE negotiations. After Richmond informed its employees that it was seriously considering SITE, Dreesman declined HR's June 3, 1999, invitation to rescind his voluntary termination in light of this announcement. Since Dreesman indicated that his reason for keeping his retirement date unchanged was that he thought his union was not going to approve SITE, plaintiffs argue Chevron should have advised him that negotiations were still ongoing and that he should wait until they officially concluded to retire. However, plaintiffs cite no legal authority to support their novel theory that ERISA requires employers to keep employees abreast of their own unions' assessment of pending negotiations. The judgment against Dreesman is affirmed.

### 2. Active Misinformation

■ Although the district court determined that SITE was not "seriously considered" until the mid-May Meeting, the court also concluded that several prior Chevron misrepresentations were material and thus amounted to breaches of its fiduciary duties. Our holding in *Wayne v. Pacific Bell*, 238 F.3d 1048 (9th Cir.2001), recognized actionable material misrepresentations are not necessarily limited to periods of serious consideration: "even before serious consideration begins, an employer-fiduciary has a duty not to actively misinform its employees [about the availability of future retirement benefits] in an attempt to induce them to retire earlier than they otherwise would." *Id.* at 1054, *citing Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 124 (2d Cir.1997). Chevron appeals from the judgments in favor of the plaintiffs who prevailed on this theory, while the unsuccessful plaintiffs cross-appeal the denial of relief.

■ Chevron incorrectly asserts that Steelman's statements must have been "false" for Chevron to be held liable. The active misinformation standard in *Wayne* is clear: "A person actively misinforms by saying that something is true when it is not true. But the person *also misinforms by saying that something is true when the person does not know whether it is true or not.*" *Wayne,* 238 F.3d at 1055 (emphasis added).

■ Chevron further insists that the district court erred in holding that an employer need not "subjectively *intend* to induce earlier retirements ... [;] under ERISA, employers are deemed to intend the reasonably foreseeable consequences of their misinformation when that misinformation induces earlier-than-otherwise retirements." Chevron contends that this standard is too low and that instead the plaintiffs must show scienter as they would if they were suing under the common law cause of action for deceit. The scienter requirement would be met, according to Chevron, by establishing "[k]nowledge or belief on the part of the defendant that the representation is false." W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 105, at 728 (5th ed.1984).

We fail to see the logic in transplanting the element of scienter from the tort of deceit into a statutory ERISA claim with roots in the law of fiduciaries and trusts. *See Varity,* 516 U.S. at 496, 116 S.Ct. 1065("[W]e recognize that [ERISA's] fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment."); *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 152–53, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985) (Brennan, J., concurring) ("Congress intended by § 404(a) to incorporate the fiduciary standards of trust law into ERISA...."). Trust law imposes a duty,

when dealing with the beneficiary on the trustee's own account, "to communicate to the beneficiary all material facts in connection with the transaction *which the trustee knows or should know.*" RESTATEMENT (SECOND) OF TRUSTS § 173 cmt. d (1959) (emphasis added); *see also Bixler v. Cent. Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300 (3rd Cir.1993) (looking to comment d of section 173 in stating that ERISA section 404's "duty to inform ... entails ... a negative duty not to misinform"). Thus, by holding Steelman and Chevron liable for the "reasonably foreseeable consequences of their misinformation," the district court accords with the common law of trusts that attaches liability for information the trustee "should have known." In articulating Ninth Circuit law in this area, we have followed a line of cases from our sister circuits that does not require a showing of intent. *E.g., James v. Pirelli Armstrong Tire Corp.,* 305 F.3d 439, 449 (6th Cir. 2002) ("A fiduciary breaches his duty by providing plan participants with materially misleading information, 'regardless of whether the fiduciary's statements or omissions were made negligently or intentionally.' " (internal citation omitted)).

On the other side, the plaintiffs would have us go further and hold Chevron liable for negligent misstatements. Such a standard would be an oxymoronic command not to "negligently actively misinform" and would provide confusing guidance to ERISA fiduciaries. We have cautioned in the past that too low a materiality standard "risks being overly burdensome and could easily become counter-productive by discouraging employers from considering such proposals in the first place." *Bins,* 220 F.3d at 1049; *see also Fischer,* 96 F.3d at 1539 ("ERISA does not impose a duty of clairvoyance on fiduciaries. An ERISA fiduciary is under no obligation to offer precise predictions about future changes to

its plan." (internal quotations and citations omitted)).

■ The district court properly concluded that "there ceased to be a reasonable basis [in fact] for the 'Not at Richmond' policy no later than April 22 when Mr. Steelman reversed himself and agreed to send out SITE letters for the HR staff at Richmond." The district court's unchallenged factual findings establish that Richmond's management (including Steelman) represented, via "Rumor Busters" and town hall meetings, that SITE would not be offered to any of its employees. Likewise, it is undisputed that Steelman, on April 22, 1999, succumbed to the Team's pressure to permit Richmond's HR workers to receive SITE preference letters and faced further insistence from Gyorfi and the Team to implement SITE for Richmond's upper-level management. At this point, Steelman no longer "kn[ew] whether it [was] true or not," *Wayne*, 238 F.3d at 1055, that SITE would not be implemented at Richmond. It also became possible that SITE would be extended to the rank-and-file given Steelman's strict adherence to his equality principle. Thus, by not removing the now-false "Rumor Busters" postings, Steelman was "saying that something [was] true when it [was] not true," *id.*, and hence actively misinforming Richmond's workforce. *See id.* (reversing summary judgment by pointing to "evidence in the record that [the plan's fiduciary] affirmatively represented to its employees that no offer of an improved benefits package would be offered when, in fact, [the plan's fiduciary] knew that it would propose such a package to the Union and that there was at least a reasonable probability that some version of the package would ultimately be incorporated into the collective bargaining agreement"). Since the district court found that the post-April 22 misinformation induced Plaintiffs Miller, Mathews, and Buchanan to retire, we affirm the judgment in their favor.

■ We next discuss whether Chevron actively misinformed the plaintiffs between February 26 and April 22, 1999. The evidence in the record is such that we are left with a "definite and firm conviction that a mistake has been committed," *McClure v. Thompson*, 323 F.3d 1233, 1240 (9th Cir. 2003), by the district court in finding that Chevron, during that time period, "represent[ed] that a final decision had been made." When we examine the communications of Richmond's management for any representation of a final decision, we observe none: Richmond expressed only what it *presently intended* to do, not what it *conclusively decided*. The February 19, 1999, "Rumor Buster" stated that Richmond was "*not planning to have a severance package . . . in the foreseeable future*" as conditions were unripe for such a plan "*at this time*" (second emphasis added). The next "Rumor Buster" continued to speak of SITE in tentative terms, commenting that "the refinery does not have plans to utilize [SITE]." This "Rumor Buster," as well as the posting on April 21, 1999, also indicated that Richmond was unable to cut its workforce "at this time." The letter Steelman sent to a Richmond union fits the pattern, asserting that "*at this point in time*, we have determined that we do not have a clearly identified need to reduce the number of employees in your bargaining unit through involuntary terminations and, therefore, we do not plan to utilize this Program *at this time*. Of course, if our plans in this regard change for any reason (which *at this time* we do not expect), we would contact you to discuss this matter further at that time" (emphasis added).

By consistently limiting its statements with the phrase "at this time," Richmond's management—and hence Chevron—explicitly communicated that its plans were subject to change. Steelman's steady chorus of "not at Richmond" does not imply a

decision has been made; when considered in the full context of Richmond's communications, the refrain loses any connotation of finality. Moreover, whether Steelman should have known his downsizing strategy would fail or that the Team might overrule his intention not to use SITE is of no consequence. Richmond made no representation that it "ruled out plan changes for the immediate future, when in fact it had not." *Ballone*, 109 F.3d at 120. "[M]ere mispredictions are not actionable . . . ." *Id.* at 125.

Given our definite and firm conviction that a mistake has been committed, the district court's determination that Chevron "actively misinformed" plaintiffs between February 26, and April 22, 1999, cannot stand. Moreover, we need not decide if Chevron, by promising employees in its initial "blue-top" that local management would keep them updated on plan changes, assumed a duty to correct any misleading information prior to the commencement of serious consideration, as there was no misrepresentation to correct until April 22, and the plaintiffs challenging the district ruling on this issue had already retired by that date. *See Bins*, 220 F.3d at 1054 (stating that ERISA does not "impose on employers a duty to follow up an employee's inquiry in the absence of an assurance from the employer that it will provide an update").

Our conclusion that Chevron did not actively misinform the plaintiffs prior to April 22 compels us to reverse the judgment in favor of Plaintiffs Hord, Munn, and Rush who retired before then. In addition, we uphold the judgment in favor of Chevron with respect to the claims of Plaintiffs Whatley, Smith, and Moungovan since they, too, based their retirement decisions on statements made prior to April 22, 1999. We likewise affirm summary judgment on those grounds against Plain-tiffs Carlock, Morton, Bateman, and Milton who retired before February 26, 1999.

## III.

■ Chevron asserts the injunctive relief awarded by the district court to Plaintiffs Miller, Mathews, and Buchanan is precluded by ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3). In part, this section authorizes a plan "participant, beneficiary, or fiduciary" to bring a civil action "to obtain other appropriate equitable relief (i) to redress such violations [of ERISA] or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(B); *see also Varity*, 516 U.S. at 510, 116 S.Ct. 1065 ("The words of subsection (3) . . . are broad enough to cover individual relief for breach of a fiduciary obligation."); *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 727 (9th Cir.2000) ("When a fiduciary breaches its duty and relief is not otherwise available under the statute, § 502(a)(3) of ERISA provides for individualized equitable relief."). The "equitable relief" to which section 502(a)(3) refers is limited "to those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). As we have stated, "[i]n determining whether an action for equitable relief is properly brought under ERISA, we look to the 'substance of the remedy sought . . . rather than the label placed on that remedy.'" *Westaff (USA) Inc. v. Arce*, 298 F.3d 1164, 1166 (9th Cir.2002), *quoting Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1528 n. 5 (9th Cir.1993).

■ We apply those principles to the relief fashioned by the district court:

A money-damage award is prohibited by ERISA. Equitable relief, however, is not proscribed. To do equity and to

cure its breach of its own fiduciary duties (based on acts and omissions of its agents), Chevron, as the plan administrator and sponsor, is hereby ORDERED to take all steps within its authority to modify the plan records to show that the foregoing six plaintiffs were involuntarily discharged as of the date of their separations, and to ensure that said six plaintiffs are provided the SITE benefit in accordance with said change.

(internal citations omitted). Chevron contends that this relief, labeled "equitable" by the district court, is in substance nothing more than an order to pay money damages, and thus outside the ambit of section 502(a)(3). *See Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 210, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) ("Almost invariably ... suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.... And money damages are, of course, the classic form of *legal* relief." (internal quotation marks, brackets, and citations omitted)).

On its face, an order to modify plan records is not an award of monetary damages. More importantly, the relief granted by the district court here is also equitable in substance. To instate the plaintiffs retroactively into SITE simply puts them in the position they would have been had Chevron not breached its fiduciary duty: as employees who "self-tapped" and indicated a willingness to be involuntarily terminated to receive the SITE benefit. Although in this instance the district court's remedy will result in Chevron paying plaintiffs "sums of money" equivalent to the SITE benefits they lost because of Chevron's breach, the mere payment of

money does not necessarily render the award compensatory "monetary damages." Rather, it is significant that a Chevron employee who "self-tapped" did not automatically qualify for SITE benefits; SITE candidates had to meet other miscellaneous requirements, and the decision to terminate an employee still ultimately resided with management. According to an undisputed district court finding of fact, "those who stepped forward and tapped themselves had no guarantee of receiving a termination." The sole reason successful plaintiffs will receive the monetary SITE benefit without comparable uncertainty is that the parties stipulated that "all of the plaintiffs, had they expressed such interest, would have been selected for involuntary termination."

Moreover, the relief granted by the district court—inclusion of the plaintiffs in the SITE program—is similar to that upheld by the Supreme Court in *Varity.* In affirming that section 502(a)(3) provided injured beneficiaries a remedy, the Court implicitly approved the remedy itself, namely "an order that [the plan administrator] reinstate its former employees into its own plan." *Varity,* 516 U.S. at 495, 116 S.Ct. 1065; *see also Reynolds Metals Co. v. Ellis,* 202 F.3d 1246, 1249 (9th Cir.2000) ("The remedy the Supreme Court endorsed in *Varity* was reinstatement, a traditionally equitable one."). If "reinstating" employees into a plan constitutes "appropriate equitable relief," there is no reason to conclude that "instating" them would not.

The cases cited by Chevron do not compel a contrary result, as all involve compensatory damages claims under either contract law, *Honolulu Joint Apprenticeship & Training Comm. of United Ass'n Local Union No. 675 v. Foster,* 332 F.3d 1234, 1238 (9th Cir.2003) ("There is no indication ... that [the plaintiff] seeks anything other than monetary compensa-

tion on a breach of contract claim."); *Westaff (USA)*, 298 F.3d at 1166("Westaff is seeking to enforce a contractual obligation for the payment of money...."); *FMC Med. Plan v. Owens*, 122 F.3d 1258, 1261 (9th Cir.1997) ("Essentially, FMC seeks a breach of contract claim for monetary relief ...."), or tort law, *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1009 (9th Cir.1998) ("The [plaintiffs'] claims are for loss of [the decedent's] chance of survival, for out of pocket costs, loss of income, loss of consortium, and emotional distress."); *McLeod v. Or. Lithoprint Inc.*, 102 F.3d 376, 378 (9th Cir.1996) ("This is in essence a negligence claim, for which [the plaintiff] seeks to be made whole through an award of money damages...."). Indeed most of these cases explicitly distinguish the compensatory relief sought from the reinstatement upheld in *Varity*. *See, e.g., Bast,* 150 F.3d at 1010("The equitable remedy provided by the Court in *Varity*, however, was reinstatement, not money damages."); *Owens,* 122 F.3d at 1261–62; *McLeod,* 102 F.3d at 379(observing that the "plaintiffs in *Varity* were seeking reinstatement as participants in the employer's ERISA plan" and that "[r]einstatement is equitable, not compensatory relief"). Finally, because our conclusion that the remedy was "appropriate equitable relief" is consistent with our case law, we will not consider overruling any prior Ninth Circuit opinion as urged by the Department of Labor appearing as amicus curiae, even if we had power to do so.

Plaintiffs Miller, Mathews, and Buchanan may have their costs against Chevron. Chevron is entitled to its costs for the claims of the remaining plaintiffs.

AFFIRMED IN PART AND REVERSED IN PART.