NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0335n.06
Filed: May 14, 2007

Case No. 05-6010

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| NANCY ALEXANDER *et al.*, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| BOSCH AUTOMOTIVE SYSTEMS, INC., | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| UNITED AUTO WORKERS, LOCAL 2296, | ) | |
| | ) | |
| Defendant. | ) | |

BEFORE: BATCHELDER and MOORE, Circuit Judges; COHN[*], District Judge.

ALICE M. BATCHELDER, Circuit Judge. Defendant Bosch Automotive Systems, Inc.

("Bosch"), appeals the district court's ruling in favor of Plaintiffs Nancy Alexander and thirty-five

other former employees (collectively referred to as "Plaintiffs") on Plaintiffs' claim of unlawful

interference with plant closure benefits pursuant to Section 510 of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1140. After finding Bosch liable on that claim, the district

court ordered Bosch to "instate" Plaintiffs to the list of employees eligible to receive plant closure

benefits under Bosch's collective bargaining agreement. Bosch concedes liability on appeal, arguing

that we should reverse the district court's judgment because the remedy is not "appropriate equitable

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

relief" as permitted under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Because we agree that the district court did not grant "appropriate equitable relief," and because we are unable to identify any other equitable relief that would be appropriate in this case, we **VACATE** the judgment of the district court and **REMAND** with instructions to enter judgment consistent with this opinion.

## I.

During the 1990s, Bosch operated an electronic motors manufacturing facility in Hendersonville, Tennessee. Because the plant was unprofitable during most of its history, Bosch continually questioned whether it should discontinue operations and close the plant. At all relevant times, the Hendersonville plant was unionized, and United Auto Workers Local 2296 ("Union") represented the employees. In July 1997 -- amidst various rumors and discussions of an inevitable plant closure -- Bosch and the Union renegotiated their collective bargaining agreement ("1997 Agreement"), which was to govern for a three-year period until July 2000. Under the terms of the 1997 Agreement, Bosch agreed to give plant closure benefits[1] to laid-off employees who retained "protected service status" -- a status that lasted for twelve months following the employee's initial layoff. The 1997 Agreement also required Bosch to provide the Union and the employees with notice six months prior to the plant's closing.

In the middle of 1998, Bosch eliminated one shift and laid off a large number of workers. In late 1998 and early 1999, Bosch management discussed future layoffs and the eventual plant closure, acknowledging that they could avoid paying plant closure benefits if they waited more than twelve months after layoffs (i.e., until the employees' protected service status expired) to close the

---

[1] The plant closure benefits included lump sum severance pay, a special early retirement option, and a plant closing pension option.

plant. After numerous meetings and virtually endless discussions, Bosch eliminated another shift and laid off sixty-three additional workers on October 29, 1999; Plaintiffs were included in this group of laid-off employees and were given the lay-off benefits mandated by the 1997 Agreement. On May 11, 2000, Bosch announced it would be closing the Hendersonville plant in November 2000 -- just over twelve months after the October 29, 1999, layoff; Bosch also announced that any employee who had been laid off more than six months prior to May 11, 2000, which included Plaintiffs, would not receive plant closure benefits under the terms of the 1997 Agreement.

Because the 1997 Agreement was set to expire on July 16, 2000, Bosch and the Union negotiated an agreement to govern the period between July 2000 and November 2000. The Union was eager to extend the 1997 Agreement because the remaining sixty-nine workers at the plant risked losing their benefits if the agreement lapsed. On July 6, 2000, Bosch and the Union executed a Closure Agreement and a Layoff Agreement[2] (collectively referred to as the "2000 Agreement"). The 2000 Agreement extended the terms of the 1997 Agreement until the plant's closing in November 2000 and expressly provided that the 2000 Agreement would control in the event of a conflict with the 1997 Agreement. The active bargaining unit, which did not include Plaintiffs, ratified the 2000 Agreement on July 14, 2000. The 2000 Agreement contained Schedule 1, which listed all employees eligible for plant closure benefits and did not include Plaintiffs. As promised, Bosch closed the plant on November 17, 2000.

On January 17, 2001 -- exactly two months after the plant's closing -- Plaintiffs filed suit

---

[2]The Layoff Agreement, which was executed for the express purpose of resolving the effects of the October 29, 1999, layoff, purported to settle all claims arising out of that layoff in exchange for a lump-sum severance payment. Bosch does not seek to enforce the release in the Layoff Agreement. It appears that Plaintiffs did not sign the release or request the payments from Bosch; accordingly, Bosch did not make payments to Plaintiffs, and Plaintiffs' claims have not been released.

against Bosch and the Union. In Count One, Plaintiffs brought a claim against Bosch to recover plant closure benefits pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). In Count Two, Plaintiffs brought another claim against Bosch for unlawful interference with benefits pursuant to Section 510 of ERISA, 29 U.S.C. § 1140. In Count Three, Plaintiffs asserted a claim against the Union, alleging that the Union breached its duty of fair representation by entering into the 2000 Agreement with Bosch. The district court dismissed Plaintiffs' ERISA § 502(a)(1)(B) claim on summary judgment, and the parties voluntarily settled the duty of fair representation claim against the Union; thus the ERISA § 510 claim against Bosch was the only claim that proceeded to trial. After trial, the district court issued an oral ruling from the bench, concluding that Bosch violated ERISA § 510 by purposefully timing Plaintiffs' layoff and the plant's closing to avoid paying plant closure benefits to Plaintiffs. The court held that the October 29, 1999 layoff was itself a violation of ERISA § 510. As a remedy, the district court ordered Bosch to add Plaintiffs' names to Schedule 1 of the 2000 Agreement, thus entitling them to plant closure benefits.

## II.

When reviewing a judgment issued after a bench trial, "we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005) (citing *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004)).

Bosch devoted most of its brief to arguing that its actions did not violate ERISA § 510, but in somewhat surprising fashion -- and for no reason that is apparent to this Court -- Bosch conceded ERISA § 510 liability at oral argument. Because Bosch conceded this issue, we need not address it and express no opinion as to whether Bosch discharged Plaintiffs for the purpose of interfering

4

with their plant closure benefits in violation of ERISA § 510. Bosch presents two other arguments it did not abandon at oral argument, and we will address these in turn. First, Bosch contends that Plaintiffs' ERISA § 510 claim was filed outside the applicable statute of limitations period and should have been dismissed. Second, Bosch asserts that the district court's judgment should be overturned because the remedy was not "appropriate equitable relief" as permitted by ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

**A.**

Because ERISA § 510 does not provide its own statute of limitations, we apply the limitations period for the most analogous state law claim. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983) (stating that where "there is no federal statute of limitations expressly applicable to [a] suit," the courts "have generally concluded that Congress intended . . . the courts [to] apply the most closely analogous statute of limitations under state law"). The circuit courts have widely recognized that ERISA § 510 claims are most analogous to "state employment discrimination or wrongful termination claims." *Ellis v. Ford Motor Co.*, No. 95-1801, 1996 WL 435199, at *1 (6th Cir. August 1, 1996) (citing *Taylor v. Goodyear Tire & Rubber Co.*, No. 93-4059, 1994 WL 573913, at *1 (6th Cir. October 17, 1994)). *Accord McClure v. Zoecon, Inc.*, 936 F.2d 777, 778 (5th Cir. 1991) (construing ERISA § 510 claims "as wrongful discharge or employment discrimination claims"); *Burrey v. Pacific Gas and Elec. Co.*, 159 F.3d 388, 397 (9th Cir. 1998) (applying the state statute of limitation for claims of "wrongful discharge in violation of public policy"); *Held v. Mfrs. Hanover Leasing Corp.*, 912 F.2d 1197, 1205 (10th Cir. 1990) (noting that the "most analogous [state law] claim . . . is a claim for employment discrimination"). Under Tennessee law, the statute of limitations for employment discrimination claims under the Tennessee Human Rights Act is one

year. Tenn. Code Ann. § 4-21-311(d). The parties agree that this one-year period is the applicable statute of limitations for Plaintiffs' ERISA § 510 claim.

The parties, however, disagree on when Plaintiffs' ERISA § 510 claim accrued. The district court found that Plaintiffs' claim accrued on May 11, 2000, when Bosch announced it would close the plant in November 2000 and informed Plaintiffs that they would not receive plant closure benefits under the 1997 Agreement. Plaintiffs agree with the district court that their ERISA § 510 claim accrued on May 11, 2000, and thus they assert that their claim was timely filed in January 2001; Bosch, on the other hand, contends that the proper accrual date is October 29, 1999 -- when Plaintiffs were laid off; therefore, Bosch believes Plaintiffs filed their claim after the statute of limitations had run.

Our circuit has yet to consider the accrual of ERISA § 510 claims, but the Seventh Circuit meticulously and persuasively addressed this issue in *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129 (7th Cir. 1992). In *Tolle*, the Seventh Circuit noted that "under the federal discovery rule, a claim accrues once the party performs the alleged unlawful act and once the party bringing a claim discovers an injury resulting from this unlawful act." *Id.* at 1139. "Because the relevant portions of [ERISA §] 510 aim to prevent employers and other persons from taking action for purposes of preventing a participant from or punishing a participant for exercising his or her rights under a plan, the accrual of [a] Section 510 claim[] turns on such [unlawful] actions." *Id.* at 1140 (relying on *Heideman v. PFL Inc.*, 904 F.2d 1262, 1267 (8th Cir. 1990); *Held*, 912 F.2d at 1205). Accrual does not occur as soon as a defendant acts for an unlawful purpose; rather, accrual is delayed until the plaintiff discovers an injury resulting from the defendant's unlawful actions. *Id.* at 1140-41. Finding *Tolle*'s reasoning persuasive, we employ it in determining when Plaintiffs' ERISA § 510 claim

6

accrued.

The alleged unlawful act in this case was not Bosch's decision to lay off Plaintiffs; rather, it was Bosch's intentional timing of the layoff and plant closing to deprive Plaintiffs of plant closure benefits. This scheme involved both the layoff and the closure, and it was not fully implemented until Bosch's May 11, 2000, announcement of the plant closing. Moreover, Plaintiffs did not learn that they would be deprived of benefits until the May 11, 2000, announcement. Because Plaintiffs would have been entitled to plant closure benefits if the plant closed before October 29, 2000 (i.e., while they maintained "protected service status" which lasted for one year following their October 29, 1999 layoff), they did not learn that they would not receive those benefits until Bosch announced that it would close the plant in November 2000. Consequently, Plaintiffs' ERISA § 510 claim accrued on May 11, 2000, when Defendants' completed their alleged unlawful scheme and Plaintiffs' learned that they would not be entitled to plant closure benefits under the 1997 Agreement.

Bosch argues that Plaintiffs' claim must have accrued on October 29, 1999 -- when Plaintiffs were laid off -- because Bosch's decision to lay off Plaintiffs was the only action that affected the employment relationship. Bosch's argument relies on Sixth Circuit case law stating that a defendant's conduct must "affect the individual's employment relationship in some substantial way" in order to come within the conduct proscribed by ERISA § 510. *Adcox v. Teledyne, Inc.*, 21 F.3d 1381, 1391 (6th Cir. 1994) (quoting *West v. Butler*, 621 F.2d 240, 245-46 (6th Cir. 1980)). We are not persuaded by Bosch's argument because we have since clarified the cited propositions in *West*, noting that it is improper to interpret ERISA § 510 as "cover[ing] only conduct related to employment relationships." *Mattei v. Mattei*, 126 F.3d 794, 800 (6th Cir. 1997). We also stated that courts should not "view[] attacks on the 'employment relationship' as a *sine qua non* of § 510

7

coverage"; instead, courts should view *West*'s reference to the "'employment relationship' as an illustrative but non-exclusive description of a set of rights that are protected by § 510[.]" *Id.* We therefore reject any notion that the defendant's actions must affect the plaintiff's employment relationship in order to constitute a violation of ERISA § 510, and we consequently reject Bosch's unwarranted focus on the employment relationship -- rather than its alleged unlawful scheme -- in calculating an accrual date for Plaintiffs' ERISA § 510 claim.[3]

For the foregoing reasons, we hold that Plaintiffs' claim accrued on May 11, 2000 -- when they learned that the plant would close in November 2000 and they would not receive their plant closure benefits -- not October 29, 1999 -- when they were first laid off and were unaware whether they would receive the benefits. We affirm the district court's finding that Plaintiffs timely filed their ERISA § 510 claim.

## B.

ERISA § 510's prohibition against interfering with employee benefits is enforced through the provisions of ERISA § 502. 29 U.S.C. § 1140. ERISA § 502(a)(3) authorizes a civil action:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates . . . the terms of the plan, or (B) to obtain other *appropriate equitable relief* (i) to redress such violations or (ii) to enforce any provisions of . . . the terms of the plan.

29 U.S.C. § 1132(a)(3) (emphasis added). Thus ERISA 502(a)(3) authorizes a court to award a plaintiff "appropriate equitable relief" when a defendant violates ERISA § 510. The Supreme Court has noted that "equitable relief" as used in this context "must mean *something* less than *all* relief."

---

[3]The parties also dispute whether the statute of limitations period should be subject to equitable tolling. Because we determine that Plaintiffs' filed their ERISA § 510 claim within the relevant statute of limitations period, we need not address the issue of equitable tolling.

*Mertens v. Hewitt Assocs.*, 508 U.S. 248, 258 n.8 (1993). More specifically, "the term 'equitable relief' in § 502(a)(3) must refer to 'those categories of relief that were *typically* available in equity[.]'" *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Mertens*, 508 U.S. at 256). Traditional equitable remedies include certain kinds of injunctions and restitution, but not compensatory damages -- which are "the classic form of *legal* relief," *see Mertens*, 508 U.S. at 255 -- or "specific performance of a past due monetary obligation." *Knudson*, 534 U.S. at 211. When determining whether a remedy was typically available in equity, the Court has instructed us to "consult[] . . . standard current works such as Dobbs, Palmer, Corbin, and the Restatements." *Id.* at 217; *see Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1252 (10th Cir. 2004).

As relief in this case, the district court ordered Bosch to amend the 2000 Agreement by including Plaintiffs in Schedule 1 -- the list of employees entitled to plant closure benefits. The district court characterized this remedy as a form of reinstatement. We disagree with the district court's characterization of its remedy and find that no matter how we label this relief -- no matter which equitable term we wish to attach -- the district court's remedy is not "appropriate equitable relief" pursuant to ERISA § 502(a)(3).

We begin with the district court's belief that its relief amounts to equitable reinstatement. Reinstatement is a remedy that arises in the context of unlawful terminations from employment. *See Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 680 (6th Cir. 2000); 1 D. Dobbs, Law of Remedies § 2.9(1), p. 223 (2d ed. 1993) ("Reinstatement in a job is a remedy for job discrimination in some cases[.]"). The remedy of reinstatement requires an employer to rehire an unlawfully terminated employee to her former position or an equivalent one. *See* 2 Dobbs, *supra*, § 6.10(4), at

9

207-08. We have repeatedly recognized that there are some instances where reinstatement is not necessarily "appropriate," *see EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 836 (6th Cir. 1997); *Fleming v. Ayers & Assocs.*, 948 F.2d 993, 998 (6th Cir. 1991), and other cases where "reinstatement is not [even] possible." *Fuhr v. Sch. Dist. of Hazel Park*, 364 F.3d 753, 761 (6th Cir. 2004) (quoting *Shore v. Fed. Express Corp.*, 777 F.2d 1155, 1159 (6th Cir. 1985)). We find that this is one of those cases where reinstatement is not possible because Bosch closed the Hendersonville plant prior to the commencement of these proceedings and there are no available jobs to which Plaintiffs can be reinstated. *See Davis v. Passman*, 442 U.S. 228, 245 (1979) (involving a congressional assistant's suit against a former Congressman for unlawful discrimination and reasoning that because the defendant "is no longer a Congressman, equitable relief in the form of reinstatement would be unavailing") (internal citations omitted); *Millsap*, 368 F.3d at 1249 (recapping the district court's conclusion that "the circumstances of th[e] case made reinstatement impossible" because the plant where the plaintiffs worked had been closed); *Calhoon v. Trans World Airlines, Inc.*, 400 F.3d 593, 598 (8th Cir. 2005) (noting that the plaintiffs were "unable to seek the remedy of reinstatement under [ERISA § 502(a)(3)] due to [the defendant's] bankruptcy" and subsequent closure); *Guercio v. Brody*, 911 F.2d 1179, 1190 (6th Cir. 1990) (involving a secretary's suit of a bankruptcy judge for wrongful termination and noting that "the authority of the district court to order [the secretary] reinstated . . . is subject to question" because the bankruptcy judge retired from the court and the "secretarial position no longer exist[ed]").

Instead of reinstating Plaintiffs to their former positions, which is impossible to do in this

situation, the district court "instated"[4] Plaintiffs' names to the 2000 Agreement and characterized this as a type of reinstatement remedy. We disagree with this characterization and conclude that the type of relief ordered by the district court -- requiring Bosch to amend the 2000 Agreement by adding Plaintiffs' names to Schedule 1 -- is more like the remedy of contractual reformation, rather than reinstatement.[5] We now consider whether we can affirm the district court's remedy as a type of equitable reformation.

Reformation is a contractual remedy that was typically available in equity. *See William Cramp & Sons Ship & Engine Bldg. Co. v. United States*, 239 U.S. 221, 228 (1915); *Hearne v. Marine Ins. Co.*, 87 U.S. 488, 490 (1874) (recognizing that "reformation of written contracts . . . is an ordinary head of equity jurisdiction"); 2 Dobbs, *supra*, § 11.6(3), at 751 ("Reformation is

---

[4]We use the term "instated," rather than "reinstated," because Plaintiffs' names were not originally included on Schedule 1 of the 2000 Agreement; therefore, it does not make sense to "reinstate" Plaintiffs to an agreement in which they were not originally included.

[5]The district court relied on two cases to conclude that reinstating Plaintiffs' to the 2000 Agreement constituted "appropriate equitable relief" under ERISA § 502(a)(3). *See Varity Corp. v. Howe*, 516 U.S. 489 (1996); *Mathews v. Chevron Corp.*, 362 F.3d 1172 (9th Cir. 2003). In *Varity*, the Supreme Court considered three substantive ERISA issues: (1) whether the employer was acting in its capacity as an ERISA "fiduciary"; (2) whether the employer violated its fiduciary obligations to the plaintiffs; and (3) whether ERISA permitted individual plan beneficiaries to bring suit for harm caused by the employer's breach of fiduciary obligations. *Varity*, 516 U.S. at 492. Prior to the Supreme Court's review of these substantive issues, the Eighth Circuit affirmed "an injunction reinstating [the retired plaintiffs] as members of the [welfare benefits plan] under the terms of that plan as it existed at the time of retirement." *Howe v. Varity Corp.*, 36 F.3d 746, 756 (8th Cir. 1994). The Supreme Court did not consider the propriety of the Eighth Circuit's remedy -- ordering reinstatement of the plaintiffs into the welfare benefits plan -- because the defendant conceded that issue on appeal before the Supreme Court. *See Callery v. U.S. Life Ins. Co. in New York*, 392 F.3d 401, 406 (10th Cir. 2004) (discussing the *Varity* decision and stating that "the issue of whether the relief sought, namely reinstatement, was equitable was conceded and not before the Court"). Therefore, we do not find *Varity* to be persuasive authority on this remedy issue. In *Mathews*, the district court, after finding an ERISA violation, ordered the defendant "to take all steps within its authority to modify the plan records . . . to ensure that [the] six plaintiffs [were] provided [ERISA] benefit[s][.]" *Mathews*, 362 F.3d at 1186. The Ninth Circuit affirmed the district court's relief, finding that this "instatement" remedy was "appropriate equitable relief." *Id.* at 1187. Because we find that this type of "instatement" remedy -- requiring an employer to amend the terms of the benefit plan -- is more akin to contractual reformation, rather than reinstatement, and because the *Mathews'* decision relied in part on *Varity, see id.* at 1186 (noting that "the relief granted by the district court . . . [was] similar to that upheld by the Supreme Court in *Varity*"), we find *Mathews* unpersuasive in this context and decline to follow it.

11

historically an equitable remedy, not a legal one."). Generally stated, reformation is available where the parties to a contract reached a valid agreement, but that mutually agreed-upon understanding was inadequately, mistakenly, or fraudulently conveyed in writing. *See Perkins-Campbell Co. v. United States*, 264 U.S. 213, 218-19 (1924) (recognizing that the "well-established principles of equity jurisprudence requires the reformation of [a] contract" if there is a "mutual mistake of the parties"); *H. Prang Trucking Co., Inc. v. Local Union No. 469*, 613 F.2d 1235, 1239 (3d Cir. 1980) ("Reformation presupposes that a valid contract between the parties was created but, for some reason, was not properly reflected in the instrument that memorializes the agreement."); 2 Dobbs, *supra*, § 11.6(1), at 743 ("Where parties agree on a contract, but write it down in a way that materially departs from their true agreement, the writing may be reformed by a court having equity powers[.]"). In our case, there are no allegations that the 2000 Agreement was validly agreed upon but improperly reduced to writing. Instead, the 2000 Agreement properly reflected the underlying agreement of Bosch and the Union, and thus it is not a candidate for the traditional equitable remedy of reformation. Requiring Bosch to amend the 2000 Agreement contradicts a fundamental premise of traditional reformation by intruding upon the contracting parties' (i.e., Bosch's and the Union's) original agreement. 2 Dobbs, *supra*, § 11.6(2), at 748 ("[C]ourts have said repeatedly that reformation may not be used to foist upon the parties a contract they never made."); 2 Dobbs, *supra*, § 11.6(1), at 743 (noting that the "purpose of reformation is not to make a new contract for the parties, but rather to adequately express the contract they have made for themselves"). There is an additional reason why reformation is awkward in our case. Reformation is typically -- and perhaps always -- sought by a party to the challenged agreement. Here, however, neither party to the agreement (i.e., Bosch or the Union) is requesting reformation; rather, reformation is requested by

12

a third party (i.e., Plaintiffs).

Nor do we conclude that it would be appropriate to order Bosch to reform its collective bargaining agreement. While courts have recognized that the remedy of reformation may be used to amend a collective bargaining agreement where mistake or fraud caused the writing incorrectly to reflect the parties' agreement, *see NLRB v. Cook County Sch. Bus, Inc.*, 283 F.3d 888, 895 (7th Cir. 2002); *H. Prang Trucking*, 613 F.2d at 1239, the agreement in this case was mutually agreed-upon, accurately expressed, and properly ratified. *See United Mine Workers of Am. Health and Ret. Funds v. Robinson*, 455 U.S. 562, 576 (1982) ("[W]hen neither the collective-bargaining process nor its end product violates any command of Congress, a federal court has no authority to modify the substantive terms of a collective-bargaining contract.").[6] Bosch and the Union included plant closure benefits in their July 2000 negotiations, and their resolution of this issue deprived Plaintiffs of plant closure benefits by excluding them from Schedule 1 of the Agreement. While the Union may have breached its duty of fair representation during these negotiations -- a claim which the parties settled during the pendency of this litigation -- we are disinclined to order Bosch now unilaterally to amend the 2000 Agreement, thereby displacing Bosch's and the Union's resolution of this benefits issue. *See Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 219 (1979) ("If the parties' agreement specifically resolves a particular issue, the courts cannot substitute a different resolution."). *Cf. Jackson v. Smith*, 927 F.2d 544, 549 (11th Cir. 1991) ("Where . . . the parties have

---

[6]The alleged ERISA § 510 violation consisted of Bosch's intentional timing of Plaintiffs' layoff and the plant's closing to deprive Plaintiffs of plant closure benefits. This scheme began when Bosch laid these plaintiffs off on October 29,1999, and culminated with the May 2000 announcement of the plant-closure, well before the July 2000 labor negotiations. Because this alleged unlawful conduct did not include the July 2000 contract negotiations, we find that neither the July 2000 collective-bargaining process "nor its end product violate[d] any command of Congress," *see Robinson*, 455 U.S. at 576, especially considering that Plaintiffs have settled their duty of fair representation claim against the Union.

13

established during the course of collective bargaining the level of benefits as well as the procedure for changing those benefits, federal courts are barred from modifying those terms."); *White v. Distribs. Assoc. Warehousemen's Pension Trust*, 751 F.2d 1068, 1071 (9th Cir. 1985) (reasoning that because "the rules affecting the plaintiff's pension benefits were fixed by collective bargaining agreement," they are "insulated from judicial review under ERISA"). It is also problematic to reform the 2000 Agreement because any alleged ERISA violation occurred under the 1997 Agreement, which had expired and was no longer governing by the time Plaintiffs instituted this suit.

Having determined that the traditional equitable remedy of reformation does not characterize the relief granted by the district court, we now consider whether we could fashion any other sort of appropriate equitable relief for Plaintiffs, specifically considering whether we could award equitable restitution under these circumstances. The purpose of restitution is "to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction." 1 Dobbs, *supra*, § 4.1(1), at 552. Restitution "may be a return of a specific thing or it may be a 'return' of a money substitute for that thing." 1 Dobbs, *supra*, § 4.1(1), at 551. The Supreme Court -- in construing whether restitution qualifies as "appropriate equitable relief" under ERISA § 502(a)(3) -- has recognized that "not all relief falling under the rubric of restitution is available in equity." *Knudson*, 534 U.S. at 212 ("In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity."); *accord Sereboff v. Mid Atlantic Med. Servs. Inc.*, 126 S. Ct. 1869, 1874 (2006).

"Whether [restitution] is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought." *Knudson*, 534 U.S. at 213 (internal quotations omitted). Restitution *at law* is available "[i]n cases in which the plaintiff could not assert title or

14

right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him[.]" *Id.* (emphasis omitted) (internal quotations omitted); *see* 1 Dobbs, *supra*, § 4.2(1), at 571 (recognizing that legal restitution is available whenever the plaintiff "convince[s] the court that he ought to *recover something* from the defendant as a matter of justice or good conscience") (emphasis added). "In contrast, a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Knudson*, 534 U.S. at 213; *accord Sereboff*, 126 S. Ct. at 1874. "But where the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor, and the plaintiff cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." *Knudson*, 534 at 213-14 (alteration in original) (internal quotations omitted). "Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214.

In light of the foregoing authority, our task of determining whether we can award Plaintiffs with equitable restitution turns on whether Plaintiffs seek to recover particular property or particular and identifiable funds in Bosch's possession. We are not faced with the typical case for equitable restitution -- an instance where the plaintiff transfers identifiable funds or property to the defendant and the law orders the breaching defendant to return that specific property; indeed, the doctrine of equitable restitution is an awkward fit under these circumstances because Plaintiffs did not transfer identifiable funds or property to Bosch. *See Geissal ex rel. Estate of Geissal v. Moore Med. Corp.*,

338 F.3d 926, 932 (8th Cir. 2003) (stating that the plaintiff did not have a claim for restitution because she was not seeking to recover a benefit that she conferred upon the defendant, but a benefit indirectly conferred upon the defendant by third parties); *Calhoon*, 400 F.3d at 597 (noting that a plaintiff has a claim for equitable restitution where she "overpays and sues under ERISA to recover the specific amount that was overpaid into a particular account").

Plaintiffs seeking equitable restitution have the burden of establishing that the funds they seek are traceable and readily identifiable. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 332 (4th Cir. 2006). But here, Plaintiffs have not identified particular and traceable funds as required by *Sereboff* and *Knudson*. *See Sereboff*, 126 S. Ct. at 1874; *Knudson*, 534 U.S. at 214. Any restitutionary-type relief in this case would order Bosch to pay funds to reimburse Plaintiffs for the value of the plant closure benefits. Such a remedy does not seek "specifically identifiable funds," but rather seeks to impose "personal liability" on Bosch by recovering "some funds" from Bosch's "assets generally." *See Sereboff*, 126 S. Ct. at 1874; *Knudson*, 534 U.S. at 214. We find, therefore, that any restitutionary remedy in this case would constitute legal relief not available under ERISA § 502(a)(3). *See Callery v. U.S. Life Ins. Co. in New York*, 392 F.3d 401, 406 (10th Cir. 2004) (refusing to characterize the plaintiff's requested relief as equitable restitution because she was "not seeking to regain particular funds or property"); *N. Am. Coal Corp. v. Roth*, 395 F.3d 916, 917 (8th Cir. 2005) (reversing the district court's "award of restitution of a sum certain" and its "finding of personal liability" because these remedies were not authorized under ERISA § 502(a)(3)).

Moreover, the Supreme Court has indicated that "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages' . . . since they seek no more than compensation for loss

16

resulting from the defendant's breach of legal duty." *See Knudson*, 534 U.S. at 210. We find that any restitutionary-type relief in this case would merely compel the payment of money from a general fund and constitute money damages. It would be a severe contortion of remedies law to characterize as equitable restitution Bosch's payment from an unidentifiable fund source to reimburse Plaintiffs the value of their plant closure benefits. We therefore conclude that Plaintiffs cannot be awarded equitable restitution under the circumstances of this case.

In sum, Plaintiffs are left without a remedy that falls under the rubric of "appropriate equitable relief" as permitted under ERISA § 502(a)(3). Such an unsettling phenomenon is not unheard of in ERISA cases. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 222 (2004) (Ginsburg, concurring) (noting "a host of situations in which persons adversely affected by ERISA-proscribed wrongdoing cannot gain make-whole relief"). Our somewhat discomfiting resolution of this case is similar to that which occurred in *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246 (10th Cir. 2004), in which the plaintiffs alleged that McDonnell Douglas violated ERISA § 510 by closing its Tulsa plant "to prevent [the] [p]laintiffs from attaining eligibility for benefits under their pension and health care plans." *Id.* at 1248. The district court bifurcated the case into liability and remedial phases, and the plaintiffs succeeded in establishing that McDonnell Douglas had unlawfully interfered with their ERISA benefits in violation of ERISA § 510. During the remedial phase, McDonnell Douglas filed a motion to preclude an award of reinstatement, front pay, and backpay under ERISA § 502(a)(3). The district court granted McDonnell Douglas's motion to preclude reinstatement and front pay, reasoning that "the circumstances of th[e] case made reinstatement impossible and front pay inappropriate because the court could not conclude that but for [McDonnell Douglas's] discriminatory conduct the Tulsa plant would still be open." *Id.* at 1249. The backpay

issue progressed to the Tenth Circuit, where the court held that backpay was unavailable to the plaintiffs because it was not traditional equitable relief. *Id.* at 1254. The court concluded by stating that it was "not unsympathetic" to the fact that the plaintiffs were left without a remedy; but the court acknowledged that it was "reluctant to tamper" with ERISA's remedial scheme and noted that "there may have been other means . . . for [the] [p]laintiffs to obtain . . . relief." *Id.* at 1260.

We likewise are not calloused to Plaintiffs' distressing situation -- a conceded statutory violation without a remedy -- but we recognize that Plaintiffs might have had other remedies available to them had they brought their claims prior to the plant's closing or the expiration of the 1997 Agreement. Plaintiffs learned that they would not receive plant closure benefits in May 2000, yet they waited until January 2001 to file suit. While we acknowledge that this is not an excessive delay -- and indeed Plaintiffs filed suit quickly enough to satisfy the short statute of limitation -- we nevertheless recognize that, had Plaintiffs filed this action before the plant closed, they would at least have had a stronger argument that they were entitled to be recalled to their former positions and thus made eligible for the plant closing benefits.

We conclude by noting that Congress has provided the limited remedies found in ERISA § 502(a)(3), and it "did not intend to authorize other remedies that it simply forgot to incorporate expressly." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985); *see Dollar Sav. Bank v. United States*, 86 U.S. 227, 233 (1873) ("[W]here a statute creates a right, and provides a particular remedy by which that right may be vindicated, no other remedy than that afforded by the statute can be used."). Our role is to award the remedies Congress has prescribed, *see Callery*, 392 F.3d at 407 (stating that "the limitation of remedy [in ERISA § 502(a)(3)] is the product of the statute and [the courts] must enforce it"); our role does not extend to the expanding of ERISA remedies, *see*

18

*Knieriem v. Group Health Plan, Inc.*, 434 F.3d 1058, 1061 (8th Cir. 2006); *Calhoon*, 400 F.3d at 598. If there is to be any exception to or expansion of these remedies, it must come from Congress, not from this bench. *See Millsap*, 368 F.3d at 1260 (quoting *Guidry v. Sheet Metal Workers Nat'l Pension*, 493 U.S. 365, 376 (1990)).

## III.

For the foregoing reasons, we hold that the district court did not award "appropriate equitable relief" pursuant to ERISA § 502(a)(3). Because Plaintiffs have not established, and we have not found, any other equitable relief that would be appropriate here, we hold that Plaintiffs are without a remedy. Accordingly, we **VACATE** the district court's judgment and **REMAND** with instructions to enter judgment consistent with this opinion.